# SUPREME COURT OF TEXAS.

## GALVESTON SESSION, JANUARY, 1868.

---

### DAVID Y. PORTIS ET UX. v. WM. G. HILL, ET AL.

Both by the civil and common law there are only two methods of acquiring property, by descent or purchase.

Blended as our system is, (embracing both the law and the equity of every case under adjudication,) the principles of equity, as well as of law, are to be applied to the admissibility of proofs. And where the muniments are of ancient date, and the parties are shown to have acted upon them, and the action is as well for partition as to try title, they may be admitted, although in strict law they have not been proved and recorded as required by the statute.

Where parties have admitted and acted upon instruments they are estopped from denying them, unless the admissions were made by mistake or procured by fraud.

To pass the mere legal title from one holder to another, it is not necessary that the conveyance should be recorded in the office of registration. The title of the grantor is effectually transmitted by signing and delivering the deed. The record is to protect creditors and subsequent purchasers. (Paschal's Dig., Art. 3876, Notes 907, 908, 909.)

Where the grantor of land passed it by deed to A, and after the death of the grantor his heirs recognized this deed and confirmed it upon the death of A, the property descended to his heirs, and one who knew of all these transmissions and assented to them cannot go behind these links of title to dispute them.

A party ought not to be heard to contradict and falsify his own solemn admission and declarations made before the judicial tribunals.

The courts will not presume fraud or malversation of a public officer in order to defeat a legal title.

Nor will a court, in order to defeat a recovery, regard a possible, although doubtful, equity in a third party.

Where an ancestor has acquiesced in acts so as to conclude her, her heirs are likewise concluded.

xxx—34

Where neither the three, five, nor ten years' possession could protect the original defendants for want of actual adverse possession of the *locus in quo*, those who went into possession under these same defendants, after the action was commenced, and who are made parties by an amended petition, cannot claim the benefit of time. (Paschal's Dig., Arts. 4622–4624, Notes 1031–1033.)

The fact that the original suit was in equity, in which the plaintiffs claimed an undivided half of five leagues, cannot change this rule, even after the plaintiffs recognized a partition by their ancestors, and limited their demand to the entirety of two leagues.

All persons who purchase pending a suit have notice of the extent of the claim, and are bound to take notice until the final disposition of it, and if the plaintiff afterwards restrict his claim, they must take notice of the change ; and if they purchase pending the litigation, they need not be made parties, but are subject to be ejected as privies to their grantors, in the same suit with him.

Alien heirs of citizens of Texas had the right to inherit in coparcenary with citizen heirs under the constitution and laws of Texas. (Paschal's Dig., Art. 43, Notes 147, 247, pp. 37, 38, 39.)

Where, in a partition suit, the jury find that one heir has purchased the interest of another, the court will presume in favor of the verdict.

Where the whole judgment is in accordance with our notions of the equities of the case, minor and technical objections to the mode of the proof merely will not be considered, but the judgment will be affirmed.

APPEAL from Galveston. The case was tried before Hon. PETER W. GRAY, one of the district judges.

The original and amended record cover over five hundred pages of closely-written manuscript. In after ages, when the world shall wonder at trials about a single land grant, large enough for a kingdom, it will be a matter of regret that our reports of such cases are not *in extenso*. But the *Reporter* is limited to an intelligent statement of the narrative of facts. For a history of the case, as developed on the former trials, the learned reader is referred to 3 Texas, 373, and 14 Texas, 69. In these cases, although the suit was for partitions, the title was, to some extent, put in issue.

When before this court last, the judge who delivered the opinion said "that the evidence conduces strongly, if not conclusively, to prove that James E. B. Austin held what-

ever interest the Cummingses had conveyed to him in the hacienda as the trustee of Stephen F. Austin, who paid the consideration," and as the representatives of Stephen F. Austin were not before the court, the same was reversed and remanded.

After the cause was remanded the plaintiffs filed an amended petition, in which, among other things, they averred that the pretended claim of Stephen F. Austin had been litigated between the estate of said Stephen F. and Eliza M. Hill, the mother of the minor plaintiffs, and that by the judgment of the Supreme Court, in 1842, the interest in the hacienda, which had been conveyed by the Cummingses to J. E. B. Austin, was decreed to be in said Eliza M. Hill, and S. F. Austin's estate was perpetually enjoined from asserting any such claim. They also brought in other defendants, who had settled on the land pending this suit.

The venue was subsequently changed, by consent, to Harris county, and from there it was again changed, by consent, to Galveston county.

The cause was again tried at the spring term, 1857, and there were a verdict and judgment for the plaintiffs for the two middle leagues of the hacienda.

From this judgment Portis and wife, and those claiming under them since this suit was brought, appealed.

Those familiar with the Spanish law must know that a hacienda is five leagues of land. (Paschal's Dig., Art. 515, Note 342.)

The statement of facts proves the grant of the hacienda of five leagues to James Cummings, on the 9th of August, 1824; that James Cummings sold half of it to James E. B. Austin on the 5th of August, 1825; that James Cummings died in 1826, leaving no wife or descendants, and but one ascendant, his mother, Rebecca; that he left an instrument purporting to be a will, in which he declared that his brothers, John and William, were equally inter-

ested with him in the hacienda when he obtained it, and that he gives it to them. He also gives his sisters, Sarah and Rebecca, (now Rebecca Portis,) a league of land on the Bernard, and the residue of his estate equally between his brothers and sisters; that John and William executed a deed on the 12th of June, 1828, in which they recite the will and recognize it, and by which they convey to James E. B. Austin the two middle leagues of the hacienda, and declare that said two leagues are bounded on the west by a league and a half that William has taken as his part, and on the east by a league and a half that John has taken as his part; that the original contract for the sale of the half of the hacienda from James Cummings to James E. B. Austin was made by Stephen F. Austin, the brother of James E. B. Austin, and that Stephen F. paid the consideration therefor; also, that the deed from John and William to James E. B. Austin for the two middle leagues was made and intended as a partition between Stephen F. and John and William; that they all agreed to it, and afterwards claimed portions of the hacienda in accordance therewith; that Rebecca Cummings, the mother of James Cummings, who was, by the law then in force, his forced heir, died in 1831 or 1832, without ever making any objection to the will; that her heirs were John Cummings, Rebecca Portis, the defendant, and Samuel A. Cummings, son of William Cummings, who had previously died. The said John and William, the father of Samuel A., recognized the will and acted on it in making a partition of the hacienda. Rebecca Portis acted on and recognized the will of James Cummings, when she administered upon John Cummings' estate, and inventoried the lower part of the hacienda as his estate in 1839 and 1840; and again, when she presented the will to the probate court of Austin county, with a petition for its probate, in 1840; and again, in 1843 and 1844, when she administered upon William Cummings' estate, and inventoried the upper part of the

hacienda as his estate; and again, within the last three or four years, when she set it up and claimed the Bernard land under it, in a suit between herself and Samuel A. Cummings.

The defendants in this suit are Rebecca Portis, and those claiming under her since the institution of this suit, and Samuel A. Cummings, son of William, and the unknown heirs of Samuel and Thomas Cummings, who were brothers and heirs of John Cummings, who died about 1839. They claimed title in the hacienda under John and William, whose title to it was recognized by the will of James.

A perfect legal title was thus claimed to be in James E. B. Austin for the two middle leagues.

The statement of facts shows that James E. B. Austin married Eliza M. Westall, the mother of the minor plaintiffs in this suit, about 1826 or 1827; that he died about 1828 or 1829, leaving a son, Stephen F. Austin, Jr., his only heir; that this son died, a minor, about February, 1837, leaving his mother, Eliza M., his only heir; that Eliza M. married William G. Hill, in December, 1835, or January, 1836; that she died about June or July, 1847, leaving the six children, minor plaintiffs in this suit, her only heirs; that William G. Hill, father of the minor plaintiffs, was the administrator of the estate of Eliza M. Hill.

In regard to any equitable interest claimed to have been in Stephen F. Austin, the statement of facts shows that Stephen F. Austin died in December, 1836, and that his relatives and heirs were his sister, Emily M. Perry, and his nephew, Stephen F. Austin, jr.; that he left a will, in which he claimed to own this land, and devised it to his sister, Emily M. Perry, and his nephew, Stephen F. Austin, jr., son of James E. B. Austin, as his residuary devisees, they being also his heirs at law, and also appointed James F. Perry his executor; that the will was probated and let-

ters of executorship were issued to Perry; that Perry, as executor, brought a suit against Eliza M. Hill, the mother of the minor plaintiffs, to whom the legal estate had descended from James E. B. Austin, through her son, to recover this land; that this suit was finally decided in the Supreme Court in 1842, Emily M. Perry also being a party to the suit, and this land was decreed to be in Eliza M. Hill, and the estate of Stephen F. Austin was perpetually enjoined from suing for the same.

The legal and equitable interest, under the deed from John and William Cummings to James E. B. Austin, for the two middle leagues, was thus shown to have been in James E. B. Austin from the date of the deed, from whom it came by descent to the plaintiffs.

The defendants who set up limitation are Portis and wife and the German settlers claiming under them, who went into possession after this suit was brought, on the 14th of March, 1845. The claims of these settlers all originated subsequent to 14th March, 1847, two years after the original petition was filed. Claiming under Mrs. Portis, their rights rested upon her title. It has been shown that she had no title to any part of the hacienda, except as the heir of John Cummings. All the witnesses stated that John Cummings never lived on or cultivated any part of the hacienda but the old mill-place, which all the witnesses who know its locality say was on the lower league and a half, that had been set apart to him as his portion of the hacienda on the 12th of June, 1828, as appears by the deed of partition between John and William of that date, and by his recital in the deed from John and William to J. E. B. Austin for the two middle leagues of the same date.

There was much evidence to support the plea of limitation of 1848, and much in contradiction, but, in the view taken by the court, it need not be given. The acts of Cum-

mings and his mother seemed to contradict the idea of possession under them until 1840.

Mrs. Hill was married to William G. Hill in December, 1835, or January, 1836, and she died in June or July, 1847; her right accrued on the death of her son in February, 1837. She was under coverture from the time her right accrued till her death, and this suit was brought 14th March, 1845, more than two years before her death.

The German defendants could not avail themselves of the three years' limitation for any part of the two middle leagues, for they claimed under Mrs. Portis, and showed no regular chain of transfer from or under the sovereignty of the soil.

The statement of facts says that all their deeds were from Portis and wife, of dates between the 14th March, 1847, and February, 1855. No evidence is contained in the statement of facts, or was offered, about the time when any of them went into possession, except Albert Hagerman, who moved on his tract in the fall of 1847.

These are the great facts of the case, as they present themselves to the *Reporter*. Others (perhaps necessary to a clear understanding) will be found in the points of the learned counsel and in the opinion of the court.

*Wm. G. Hale* and *A. P. Thompson*, for appellants.— I. The amendment was designed to evade the operation of the decision of this court, made on the last appeal, and we contend that it ought not to have been received, but should have been struck out, upon the exception of the defendants, on the ground that it introduced an entirely new cause of action. (Beal v. Alexander, 6 Tex., 531; Carter v. Reynolds, 6 Tex., 561; Pridgin v. Strickland, 8 Tex., 436; Russell v. Sprigg, 10 La., 423; Pratt v. Bacon, 10 Pick., 128; Verplanck v. Merchants' Insurance Co., I Ed., ch. 46.)

And if the amendment should, for the sake of convenience only, have been allowed, it will not be permitted to relate back to the filing of the original petition, so as to affect a defense to the new matter, under the statute of limitation; and it will only be admitted upon the payment of all the prior costs of suit. (Henderson v. Kissam, 8 Tex., 46; Pridgin v. Strickland, 8 Tex., 436; Williams v. Randon, 10 Tex., 74; Ayres v. Cayce, 10 Tex., 99; Bell v. McDonald, 9 Tex., 378; Smith v. McGaughey, 13 Tex., 464; Hopkins v. Wright, 17 Tex., 30; Holmes *et al.* v. Trout, 7 Pet., 213; Slater v. Nasen, 15 Pick., 345; Jackson v. Murray, 1 Cow., 156.)

II. But it will be noticed that the district court considered the amendment as proper, and refused to allow the defendants the benefit of the intervening time upon their pleas of limitation, and that the rulings of the court upon these points determined the decision of the cause. The view of the case taken by the district judge was particularly inapplicable to the new defendants, who were, for the first time, brought into the cause after the amendment had changed its entire character. And there seems to be no excuse for the refusal of the district court to impose, in the taxation of costs, the burden of the previous costs of the suit upon the successful plaintiffs.

Upon the trial of the cause, it appeared, by conclusive evidence, that J. E. B. Austin had no interest whatever in the transfer made nominally to him, but that Stephen F. Austin was the true owner. And as this court had already decided (14 Tex.) that the true owner alone could sue, the plaintiffs then changed their ground, and attempted to deduce a title to the two middle leagues from S. F. Austin. There are two principal links in the chain of title: First, the will of Stephen F. Austin; second, the judgment, by agreement, of the Supreme Court, in January, 1842, by which the plaintiffs claim that the title vested by the will

in Mrs. Perry was transferred by her to the plaintiffs. Under the will, the plaintiffs claim one-half of the interest of S. F. Austin in this land by the devise to S. F. Austin, jr.; and by the judgment they claim the transfer of the other half from the devisee, Emily W. Perry, to Eliza M. Hill, the plaintiff. Upon this assumed derivation of title, affirmed by the charge of the district court, the plaintiffs recovered. Now, it is evident that if the judgment or will should prove to be inoperative to transfer the interest vested in Stephen F. Austin, then the plaintiffs fail in establishing their title.

We shall, therefore, attempt to show that neither the will of Austin nor the judgment of the Supreme Court were evidence of any title in the plaintiffs.

1. The Will.—Stephen F. Austin died in December, 1836, leaving an olographic will, executed on the 19th of April, 1833, before seven witnesses. A copy of this will was offered in evidence and admitted, contrary to the objections of the defendants. These objections will be presented by the other counsel. The ninth clause in the will directed "that all the residue of my property shall be divided into two equal portions; and I give and bequeath to my sister, Emily M. Austin, wife of James F. Perry, one of said portions, and the other portion I give and bequeath to my nephew, Stephen F. Austin, jr., son of my brother, James E. B. Austin, and Eliza Martha Westall, his wife. In case my said nephew should die without legal issue, then this bequest to him shall pass to and be inherited by my sister Emily and her heirs, and by no other person." The eleventh article stated "that the lands purchased from individuals, and deeded to James E. B. Austin, belong to me, and are to be classed as my property."

The district court instructed the jury that, under this will, the estate devised to S. F. Austin, jr., passed, upon his death, in February, 1837, without issue, to his surviving

mother, then the wife of Hill. This instruction assumed that the devise over to Mrs. Perry was void. No reason is assigned for such a rule; but it is supposed that the objections which weighed most with the district judge were, that the devise over was prohibited by the decree of August 7, 1823, of the Congress of Mexico, on the subject of "*vinculaciones*," and by the seventh article of the declaration of rights of the constitution of the republic. We shall reply briefly to these objections.

The plaintiffs, claiming under the will, have no right to attack it in a collateral manner in order to impeach its validity. But if it were admitted that they had such right, their attempt is unavailing. The decree of August 27, 1823, and the decree of the Spanish Cortes, September 21, 1820, to which it refers, relate alone to what is called, in Spanish law, "*vinculaciones;*" that is, settlements of property intended to pass from one member of a family to another, perpetually, without power of alienation or strict entailments. This is evident from the title of the Mexican decree, by the constant usage of the terms "*vinculados*" and "*vinculaciones*," by the reference in the 7th article to "*fidei comisos familiaries*," in the 9th article to the "*fundacion;*" in short, by every word of the decree. Now, the characteristics of a "*vinculacion*" are, that the property remains, for all time, in the same family, and that none of the successive takers can alienate it. (Escriche Dicc., tit. "VINCULACIONES," "BIENES VINCULADOS.") One species of "*vinculacione*," and the principal one, was the *mayorasgo;* another, the *capellania;* another, the *patronato;* and another, the "*fidei comiso;*" not every kind of *fidei comiso*, but that which required the perpetual transmission of property from one successor to another, known as the *fidei comiso familiar*. (Escriche Dicc., FIDEI COMISO.) The Roman law permitted a *fidei commissum* to be instituted, so as to pass to four degrees of successors; but the

Spanish law did not originally limit the transmission, and it became one of the modes of creating a *mayorasgo*. The intention, however, to make such a perpetual transmission had to be distinctly expressed; otherwise the *fidei comiso* 'would terminate within the last heir specially pointed out, and he would take the estate untrammeled.

The devise over contained in Austin's will does not constitute a *mayorasgo, patronato de. legos,* or *fidei comiso familiar.* It showed no intention of creating a perpetual family inheritance. It stops with Mrs. Perry, and leaves her power of disposition unfettered, except by the usual restrictions of the Spanish law as to forced heirs. The words, " and by no other person," show that the bounty of the testator had reference to her alone, and was designed for her benefit, and not the vain and empty creation of a family dynasty. In fact, the whole clause is simply directed to the institution of a "*fidei comissario substitutio,*" as it is understood in the Spanish law; that is, a substitution of a second heir upon a certain condition: in this case, upon the death of the first heir without issue. (See Escriche, " SUBSTITUTIO FIDEI COMMISSARIA," *Febrero* ed. 1851, vol. 1, art. 1443.) There is nothing. in this analogous to a "*vinculacion.*" Indeed, this very case is discussed by Gomez in his Variæ Resoluciones, vol. 1, ch. 5, No. 42, where he shows that, by a clause in a will identical with that under discussion, no "*vinculacion*" was created. And the difference between a *fidei commissaria substitutio,* like this, and a *fidei commissum familiar,* is well shown by Hermosilla, in part V, tit. v, l. 44, gloss 5 to 14. That the decrees of the Spanish Cortes and the Mexican Congress did not abolish such institutions appears beyond the possibility of a doubt by all the modern treatises upon Spanish and Mexican law, published since these decrees, in which the law of substitutions is still treated as unaffected

by the decrees, while in reference to the *mayorasgos* and other entailments their effect is acknowledged.

2. As to the prohibition contained in the constitution of the Republic, that is equally inapplicable. The will of Austin, made in 1833, is to be construed, as to the meaning of its terms, by the principles and rules of construction of the Spanish, not the common law; and the natural and logical meaning of the word " issue " is " children." (4 Kent's Com., 278, note; 1 Vesey, Jr., 149, note 3.)

Now, taking the phrase "should die without legal issue" to mean, as it naturally does, " should die without children living at his death," and upon the rule of the common law, could an entailment be said to be created? The contrary signification attached to the words " dying without issue," so as to make them imply an indefinite failure of issue generally, and to raise an estate tail, is forced upon the phrase, contrary to the usual and natural sense by early decisions, reprobated by judges of the present day, but followed merely from their force as precedents, (1 Vesey, Jr., 286, note 3; Keiley v. Fowler, 6 Bro., P. C. 309.) Thus, every effort is made to evade the effect of this construction by a reference to the context of the will, and if, from any part of it even, a doubtful or remote intention of the testator can be deduced to show that he meant "issue living at the time of the death" of the first taker, the first estate is made one in fee, or for life, not in tail, and the devise over is a good executory devise. (Excel v. Wallace, 1 Ves., Sr., 118; 3 Greenl. Cruise, top p. 212, notes; Slater v. Dangerfield, 15 Mees. & W., 263; Greenwood v. Rothwell, 5 Mann. & G., 621; Sibley v. Perry, 7 Ves., 531; Lee v. Mosely, 1 Y. & C., 589; Oxford v. Churchill, 3 V. & B., 67; Doe v. Webber, 1 B. & A., 173; Keiley v. Fowler, 6 Bro. P. C., 309; Darley v. Martin, 78 E. C. L., 683; 12 Ves., 476; 17 Ves., 479; 19 Ves., 73, 545; 1 Mer., 20; Jackson v. Chew, 12 Wheat., 153; Porter v. Bradley, 3 Tenn., 143; Roe v. Jeffery,

7 Tenn., 589; Fosdeck v. Cornell, 1 Johns., 440; Jackson v. Cornell, 3 Johns., 289; Jackson v. Staats, 11 Johns., 337; Anderson v. Jackson, 16 Johns., 382; Leon v. Burtiss, 20 Johns., 483; Pendleton v. Pendleton, 2 Murph., 82; Renelagh v. Renelagh, 2 Myln & Keen, 441; Moore v. Howe, 2 Munroe, 199; Dixon v. Hoomes, 1 Gratt., 303; Stanley v. Leonard, 3 Cruise, 302, 300.) Every expression will be seized at which in any degree indicates the intention of the testator, and, in those countries where estates tail are prohibited by statute, a will is not, if it is possible to avoid it, construed so as to imply one. (Cruise v. Greenl., 302, note; Smith v. Chapman, 1 H. & M., 240; Leon v. Burtiss, 20 Johns., 489; Anderson v. Jackson, 16 Johns., 435; Williams v. Casten, 1 Strobh, 134.) Now, in the present case, it is clear that the testator had in his mind the possibility of Mrs. Perry's taking at the death of this nephew, for he refers to her as the survivor, not in express terms, but by necessary implication, and he directs that she and no other person should take. So that, even upon the ordinary rules of common law construction, no estate tail was created.

3. As to the judgment of the Supreme Court at the January term, 1842, it surely needs no argument to show that the court had no jurisdiction to pronounce this judgment, for that is apparent upon the transcript exhibited. That Supreme Court was an appellate court merely, and had no original jurisdiction; but the transcript shows a cause not terminated by any judgment in the district court, but transferred to the Supreme Court, to be there continued by the mere consent of parties. The judgment, as entered in the Supreme court, exhibits no judicial will, but is a simple agreement entered upon the records of the court. The bare fact that there was no judgment in the district court is sufficient to prove the invalidity of the formal decree of the Supreme Court, and to reduce it to an extra-judicial compromise. Now, in the latter character, it should have

been signed by Mrs. Perry, and duly acknowledged and recorded, before a copy could be introduced in evidence. And as a decree or judgment for a title to land or for a partition, it should have been recorded before it was admissible in evidence. (Hart. Dig., 2765.)

III. The testimony shows, beyond dispute, that the possession of Rebecca Cummings, afterwards Mrs. Portis, had been adverse to the claim of "all the Austins" from 1839 to the present time; in other words, that she has held and claimed the middle leagues as her own since that year, not to go further back. If our construction of Austin's will is correct, then the defendants were holding against Mrs. Perry during the period from 1837 to January, 1842; and as Mrs. Perry was then married, her disability would protect her; but if the decree of the Supreme Court, in 1842, was operative to transfer the estate from Mrs. Perry to Mrs. Hill, the latter could not avail herself of her new disability, as a married woman, to resist the operation of the limitation, for disabilities cannot be tacked. (White *et ux.* v. Latimer, 12 Tex., 91; Ford v. Clements, 13 Tex., 529; Mercer's Lessee v. Selden, 1 How., 87; Floyd's Heirs v. Johnson, 2 Litt., 112, 115; Clay's Heirs v. Ford, 9 Dana, 333; Carpenter v. Schemerhorn, 2 Barb. Ch., 314.)

From January, 1842, to March, 1845, at the filing of the original petition, is more than three years; to April, 1855, the filing of the amended petition, claiming the two middle leagues, is more than ten years. Now, during the first period of three years, Mrs. Portis was holding under title or color of title, *i. e.*, under the grant to James Cummings, and descent from him to her other brothers and sister. Descent is a good link in the chain of title. (Williamson v. Simpson, 16 Tex., 444.)

And it is no answer to say that her claim by descent was not co-extensive with the whole interest in the land, in the entirety, because she asserted it to be so; and if any person could question its extent, it was only her co-heirs who

could do so. And even as to them, an adverse claim to the entirety by her would support the plea of limitation of three years after actual ouster. (Prescott v. Vevers, 3 Mason, 334; Record v. Williams, 7 Wheat., 121; 7 J. J. Marsh., 542; and see particularly Poage's Heirs v. Chinn's Heirs, 4 Dana, 51.)

Again, the whole testimony shows an adverse possession by John Cummings, against the Austins, from 1836 to the time of his death, continued by Rebecca. John Cummings, in 1836, put Sapp upon the middle leagues to hold possession for him. Sapp died in 1841, but his widow continued to hold possession of the middle leagues, under Mrs. Portis, until the winter of 1841, 1842, when James Irvin took possession, under Mrs. Portis, and retained it until the winter of 1843, 1844, when Michael Burns took possession, also under Mrs. Portis, and held it until Mr. and Mrs. Portis moved on the two middle leagues themselves. Here is a continuous possession from before the death of Stephen F. Austin, or Stephen F. Austin, jr., and, the limitation having thus begun to run, it is not interrupted by any intervening disability. (Peek v. Trustees of Randall, 1 Johns., 165; Moore's Heirs v. White, 6 Johns. Ch., 372; Damarest v. Winkoop, 3 Johns. Ch., 131; Walden v. Heirs, of Graatz, 1 Wheat., 296; Fleming v. Griswold, 3 Hill, 85; Bradstreet v. Clark, 12 Wend., 602; Jackson v. Moore, 13 Johns., 513; Jackson v. Robins, 15 Johns., 569; Tysen v. Britton, 6 Tex., 222; Chevalier v. Durst, 6 Tex., 239; Cole v. Runnels, 6 Tex., 272.)

Nor can it be said that this running of limitation was interrupted by the suit commenced by Hill and wife against Sapp, November 1, 1840, abated by his death, revived by *scire facias* against Mrs. Sapp, the administratrix, and then abandoned and dismissed by the plaintiffs, for a suit abandoned voluntarily is no interruption of limitation. (Richards, *et al.* v. Maryland Insurance Co., 8 Cranch, 84; Harris v. Dennis, 1 S. & R., 236.)

Besides, the suit against Sapp is for the upper two leagues and a half, not for an undivided interest or for the two middle leagues; and this suit, not being pleaded in reply to the pleas of limitation, cannot be used in the evidence to affect these pleas. (State v. Henkins, 6 Iredell, 428.) Nor are the disabilities of coverture or minority pleaded in reply.

The case of Poage's Heirs v. Chinn's Heirs, (4 Dana, 50,) shows conclusively that a descent of an undivided interest only is a good link in the chain of title to protect an adverse possession as to the whole, so that even the inheritance from John to Rebecca is sufficient to give color of title to the whole tract.

IV. The new parties made by the plaintiffs, called by us the German defendants, have certainly a right to protect themselves by their pleas of limitation, and the district court erred in depriving them of the benefit of these pleas. They received conveyances from Portis and wife since March, 1845, but long before the filing of the amended petition in 1855, and they had held possession, and made improvements upon small holdings, claiming against the world. They were entitled to the pleas of ten, five, and three years, those periods having elapsed between March, and April, 1855. The pendency of the original suit was clearly no notice of the character which the suit afterwards assumed. Had the plaintiffs recovered upon the original claim, the purchases made by the German defendants would have been respected by the commissioners of partition, and would have been deducted from the distributive share of Mrs. Portis; whereas by the present judgment these defendants lose all.

V. As to the other derivation of title, there was first no proof of the execution of the will of James Cummings. It was offered for probate in December, 1840, upon only the affidavits of two persons, not subscribing witnesses, to the handwriting of one subscribing witness, but the will was

not probated or recorded. The act of February 5, 1840, evidently required proof by a subscribing witness. (Hart., Art. 997.) The will not being an authentic or public document, and not having been probated, was not properly on file in the county clerk's office, and a copy cannot be received without proof of the original. Again, the will was a nullity, being executed as a private paper, without a notary or other public officer, and with only two witnesses, at a time when the law required at least three. (Nov. Rec. X, 18, 1; Febrero Mex., vol. 2, p. 5.) Nor can it be said that Mrs. Portis is estopped from imputing nullity to the will by the application made in her name for the probate, because no one is estopped by error of law, and there is nothing to show any authority from her to Jack, who signs the application. The copy of the act of sale from John and William Cummings to Austin was not admissible, because the clerk does not certify that this instrument "was filed in the office of an alcalde or judge previous to the first Monday in February, 1837." (Hart., 746.) And this requisite is not to be presumed, as the act confers a special privilege in derogation of the common law. The latter objection applies also to the copy of the act of sale from James Cummings.

VI. The sale by John and William is also invalid, because, if the will of James was a nullity, they had no title to the land until the death of their mother, in 1831, and, when they inherited from her, their inherited portion did not pass by estoppel, (that doctrine being unknown to the Spanish law,) but they were liable to a suit on the part of Austin, either for a recession of the bargain, or for a valid deed. And if the will was not an absolute nullity, still, as the mother of James was his forced heir, (Nov. Rec., X, 20, 1; Feb. Mex., vol. 2, p. 73,) he could only dispose by will to his relations of one-third of his whole estate, which third was exhausted by his first devise of one league on the Bernard. Thus, whether the will was valid or not, the title remained in the

mother until 1831, when the estate passed by descent to the three heirs then living in Texas, and capable of taking, viz: John, Rebecca, and Sarah. (Yates v. Iams, 10, 168.)

VII. It is said by this court, in Portis v. Cummings, 14 Tex., 174, that the evidence in that case showed an acquiescence by the mother for so long a time as to prevent the effect of the law; but this is not supported by the facts in this case, neither can any tacit acquiescence short of preemption, or a written transfer of right, convert a nullity into an actual and legal transfer of title. So far as the plaintiffs are concerned, not being privy to any act of the mother or Mrs. Portis tacitly recognizing the will of James Cummings, nor induced to take the sale of the two middle leagues from John and William by any act of the parties now sought to be bound, they cannot avail themselves of any estoppel. As to S. A. Cummings, his claim has never in the most remote degree been recognized by his grandmother or by Mrs. Portis. This court is in error in supposing, in the former decision, in 14 Tex., that Mrs. Portis had anything to do with his guardianship. On the contrary, when applying for the administration of William Cummings, in 1840, she plainly denies the existence of any other heir than herself, and repudiated the guardianship of McNeel.

VIII. As to Samuel A. Cummings and his claim to a recovery against his co-defendants, it will be observed, that if the new claim of the plaintiffs, set up in the last amended petition, on which the judgment was in fact rendered, is the true cause of action, then Samuel A. Cummings has no right to introduce a new controversy as to the upper league and a half, which is not affected by the plaintiffs' claim. The right of Cummings against Portis and wife should be settled in an independent suit.

If, however, the claim of Samuel A. Cummings is to be considered, we have in opposition to it the plea and proof of a forfeiture of right by an abandonment of the country.

At the former hearing of this cause the court thought that there was not sufficient testimony to show an intention of changing the domicil of nativity, and that there was testimony to show the contrary. But in the present case we show, by the direct and satisfactory evidence of the stepfather of Samuel A. Cummings, that the intention of Lucinda Cummings, the mother of Samuel, in leaving Texas, was to return to her domicil of origin for a permanent residence, and such a change of domicil of the mother unquestionably affected a change of domicil of her infant son, and was an election of nationality which extended to her son. (Poriger v. Wightman, 3 Mer., 61, 79; Inglis v. Trustees of Sailors' Snug Harbor, 3 Pet., 124, 126; Wheeler v. Hollis, 18 Tex.; Story's Confl. Laws, § 46.)

Indeed, it may be urged that the true rule is, that the single fact of a change of residence implies a corresponding intention, and shows, *prima facie*, a change of domicil, so that the *onus* of disproving the assumed intention is thrown upon the other side. (Ennis *et al.* v. Smith *et al.*, 14 How., 422, 423.) The change of domicil, if proved, amounts, necessarily, to an abandonment of the land. (Holleman's Heirs v. Peebles, 1 Tex., 673, and the other cases upon this point.) And it has been repeatedly decided by this court, that the infancy of the party changing his domicil, or abandoning the land, cannot avail him as a protection. (Goode v. McQueen's Heirs, 3 Tex., 260; Cryer v. Andrews, 11 Tex., 182.) The instructions upon this point, given by the district court, present only a partial view of the law, and those which were refused ought to have been given.

IX. But if the will of James Cummings was a nullity, or if his mother was his forced heir, then the time when descent would be cast on the defendant, S. A. Cummings, would be in 1831, on the death of his grandmother. At that time he was with his mother in Kentucky, without any intention of returning to Texas. She had married a

second time, and being then established in her native domi-
cil, could not retain her adventitious character of a Mexi-
can citizen, and her child, then under her tutelage, became,
by this perfect change of domicil, a citizen of the United
States.

As an alien, therefore, at the time of descent cast, he
could not inherit. (Blythe v. Easterling, 20 Tex., 565;
Hardy v. DeLeon, 4 Tex., 242; McKinny v. Saviego, 18
How., 238; Yates v. Iams, 10 Tex., 168.)

X. If S. A. Cummings did not forfeit his right to the
land by abandonment, he is barred by limitation. He was
born, according to the testimony of the midwife, in 1825
or 1826, and therefore came of age by the end of the year
1847. He sets up a claim to the land, for the first time, in
his amended answer, filed April 26, 1851, and he does not
claim any part of the lower league and a half, or any share
in John Cummings' estate, until 1855. More than three
years, therefore, had elapsed, during which Portis and wife
held adverse possession under color of title. The German
defendants upon the upper league and a half and the lower
league and a half can invoke the aid of limitation against
this claim without doubt.

XI. A great deal has been said about the admissions
made by Mrs. Portis. Upon examination these admissions
will result in nothing which can affect the rights of Portis
and wife. In the first place, there is no admission that
Samuel A. Cummings had any interest in the lower league
and a half. The administration upon the estate of John
Cummings approaches nearest to it; but that administra-
tion was never in fact obtained. Mrs. Portis did not qual-
ify as administrator, and in the inventory rendered by
others only the lower league and a quarter (five thousand
five hundred and fifty-five acres) is allotted to John. Now,
John died in 1839, and his only heir was Rebecca, for
Samuel A. Cummings was then an alien to the Republic of
Texas, and had not yet become a citizen of the State of

Texas, or disposed of his share in John's estate. (Hart. Dig., Art. 585.) Indeed, as John died before the passage of the act of 1840 regulating descents, the rule of the Spanish law, as established in Yates v. Iams, 10 Tex., 168, would apply, and the citizen heir would take to the exclusion of the alien. Mrs. Portis also applied for administration on the estate of William Cummings, but only gives in the inventory of the estate the upper league and a quarter as William's share. Now, this is perfectly consistent with an intention to claim the residue of the estate, after the payment of debts, as sole heir, to the exclusion of Samuel. She does not admit the right of Samuel, but only the right of William and John each to one league and a quarter, exactly the share which would have fallen to them by descent from their mother, who was the true heir of her son James; that is, the children in Texas—John, William, Sarah, and Rebecca—would each have taken one league and a quarter. Mrs. Portis also, before her marriage, is said to have applied for the probate of the will of James Cummings; but there is no proof that she ever knew of its existence. The petition for probate is not signed by her, no order of the probate court was ever made on it, and she never acted under it. On the contrary, the inventories of the estates of John and William Cummings, made upon the application of Mrs. Portis for administration, are inconsistent with the will of James, or the supposition of an acquiesence in it.

The weakness and uncertainty of parol evidence, of verbal declarations and admissions of a third party, after a long lapse of time, has been often noted by this court. Hall v. Layton *et al.*, 16 Tex., 262; Portis *et ux.* v. Hill *et ux.*, 14 Tex., 73, 74.)

*Harris & Pease*, for appellees, first criticised the facts very closely to show that by their acts Mrs. Cummings and her sons acquiesced in the title of the plaintiffs. And,

also, that from the statements of the witnesses, *seriatim,* no limitation could run in favor of any of the defendants.

II. The four first errors assigned relate to the action of the district court in entertaining jurisdiction of this cause in April, 1855, permitting the plaintiffs to file their amended petition of 23d April, 1855, and overruling the exceptions of defendants to the original and said amended petition.

The defendants say that the court of Austin county had no jurisdiction at the April term, 1855, to order a change of venue or to make any of its orders at that term, for that the cause was then pending in the Supreme Court, and the judgment of the Supreme Court, reversing and remanding the cause, was suspended until the adjournment to Tyler, which took place after the action of the district court of Austin county in April, 1855.

The mandate of the Supreme Court was filed in the district court of Austin county on the 16th March, 1855. It states the judgment of the Supreme Court on the 5th March, 1855, reversing and remanding the cause, and commands the district court to proceed in accordance therewith. Accompanying said mandate there was a copy of the opinion of the Supreme Court, at the end of which, and after the signature of the judge, was a note, stating, in substance, that as the case had been decided upon grounds not argued before the court, a motion for a rehearing would be entertained, if presented at any time before the adjournment of the court at Tyler. The plaintiffs against whom the judgment of the Supreme Court had been rendered, and the only party that could have been benefited by a rehearing, did not desire it, for they appeared and filed an amended petition. It did not appear that any such application had been made to the Supreme Court, and the mandate being absolute on its face, the district court properly proceeded with the cause.

III. The amended petition brought nothing before the court that had not previously been before it in the pleadings

of some of the parties, except the allegation that there had been a trial between the estate of S. F. Austin and those who had succeeded to the rights of J. E. B. Austin, in regard to the equitable interest, if any, of S. F. Austin in the hacienda, which had been decided in favor of Mrs. Hill, the mother of the minor plaintiffs, by the Supreme Court in 1842, before the original petition in this case was filed, and also that it made certain occupants of the land, who had gone into possession pending the suit, parties.

As early as the 26th April, 1851, Samuel A. Cummings, one of the defendants, had pleaded that the contracts between the Cummingses and James E. B. Austin concerning this land were for the use and benfit of S. F. Austin, and that J. E. B. Austin held the land for S. F. Austin; that a partition had been made by which Austin took the two middle leagues in lieu of the undivided half of the five leagues: William the upper league and a half and John the lower league and a half, and had also then brought in all the known occupants *pendente lite.*

Portis and wife had also, on the 12th November, 1851, pleaded that plaintiffs had no interest in the land sued for, but that it belonged to the estate of S. F. Austin. They also pleaded, on the 18th April, 1853, that the sales were made to J. E. B. Austin for S. F. Austin, who was the real owner.

The plaintiffs had also, on the 21st April, 1853, brought in all the known occupants pending the suit, all of whom appeared and plead the general issue on the 7th November, 1853.

All these matters were before the court when the cause was tried at the fall term, 1853, of the district court of Austin county, and were all considered by the Supreme Court, in its opinion, when the cause was reversed and remanded, in March, 1855, (14 Tex., 69,) except the adjudication between the representatives of S. F. Austin and J. E. B. Austin, upon the alleged equitable interest of S. F.

Austin. With this exception the amended petition con-
tained nothing more than a statement of the substance of
the previous pleadings of the parties. We say that this
amended petition is, in fact, nothing more than a replica-
tion to the pleadings of the defendants, previously filed.

IV. There was no error in ordering the change of the
venue, for it was made by the consent of all the parties
interested in the suit.

V. The fifth error assigned is the ruling of the court in
regard to the admissibility of testimony, as specified in the
bill of exceptions.

1. The first evidence excepted to by defendants was the
deed from James Cummings to J. E. B. Austin for half
the hacienda. This deed is dated 5th February, 1825, and
has attached to it a certificate signed by Stephen F. Austin,
in which he certifies, that as empresario for the establish-
ment of a new colony in the province of Texas, and judge and
commissioner for said colony, the said James Cummings,
accompanied by the witnesses (naming them) in his pres-
ence put the said J. E. B. Austin in possession of the tract
of land described in the preceding act of sale, which he
signed with his own proper signature, &c., &c. The cer-
tificate is signed by Stephen F. Austin, and by Samuel M.
Williams, secretary of the colony. At the end of the fore-
going is the certificate of James A. Reiley, clerk of the
county court of Austin county, with the seal of the court,
which states "that the foregoing and attached instrument
of writing in the Spanish language, styled ' titulo de renta,'
James Cummings to Santiago (in English James) E. B.
Austin" is a full, true, and perfect copy of the original,
now of file in his office, he being the proper keeper thereof.

This deed was properly admitted under the provisions of
article 746 of Hartley's Digest. (9 Tex., 97.)

It purports on its face to have been executed before a
judge in Texas, previous to the first Monday in February,
1837, as a certificate by the clerk, who states that he is the

proper keeper of the original.   The 33d section of "an act organizing inferior courts," &c., (Acts of 1st Cong., p. 154,) requires all records of this kind to be deposited in the county clerk's office.   The certificate of the clerk is similar to that in 9 Tex., 97.

2. The deed from John and William Cummings to J. E. B. Austin for the two middle leagues was also excepted to for the same reasons.   This purports to have been executed before Thomas M. Duke, *alcalde*, 12th June, 1828, and has a similar certificate of the clerk.

The objections to the two foregoing deeds were, 1st, that they were not recorded; 2d, that the clerk's certificate does not show that they were received from an alcalde or judge prior to February, 1837; and, 3d, that there was nothing in the deeds or certificates to show they had ever been on file in the office of any alcalde or judge.   No other objections than these can be made in this court.   (7 Tex., 322; 6 Tex., 60; 5 Tex., 462; 10 Tex., 520–525.)

To the first objection, we say that neither of these deeds were deeds of partition by their terms, and there is no law requiring them to be recorded before they can be admitted as evidence.

To the second objection, we say that the law before referred to (1st Cong., p. 154,) required all such deeds to be deposited in the county clerk's office.   These copies came from the proper custodian of the originals of such deeds, and they must be presumed to have come into his office properly.

To the third objection, we say that the law and practice of the country was, for all original deeds executed before judges and alcaldes, previous to the Revolution, to remain in the custody of the officers before whom they were executed, who gave to the parties certified copies.

3. In relation to the copy of the will of James Cummings, and the petition for its probate: The copy of the petition for administration on the estates of John and William, the

orders of court thereon, and the inventories, &c.—They were only offered as admissions of Rebecca Portis, that James had given the hacienda to John and William; that they had made a partition of it between themselves, and deeded to J. E. B. Austin the two middle leagues; and that she and the family had acquiesced in said will, partition, and deed; and that she had inventoried the several estates in accordance therewith. They were good evidence to show her admissions, even if the whole proceedings in regard to them were void. They were copies of records properly certified by the keeper of them.

In reply.to the ground taken in the argument, that she should not be bound by these admissions, because she was married, that was not taken in the court below, and Hillyard says that she did not marry Portis till December, 1853, so that all her action about the probate of James' will and the administration of John's estate occurred in 1839 and 1840, long before her marriage. It would seem that she married between the time she applied for administration of William's estate, on the 25th December, 1843, and the time she gave bond as administratrix, on the 29th January, 1844; for at the first date she is described as Rebecca Cummings, and at the second she signs her name as Portis.

4. The return of the surveyor and plat of the land were objected to—

1. Because not proper in rebuttal.

2. Because there was no return of notice to the parties interested.

3. Because incorrect on its face.

To the first objection we say, that it was proper evidence at any stage of the proceedings; it was necessary to enable the court to give a proper judgment upon the issues before it.

To the second objection we say, that the court had the right to order the survey under the 3222d article of Hartley's Digest. Neither the law nor the order of the court directing the survey required the surveyor to give any

notice to the parties interested, nor to make a return of any such notice.

To the third objection, the return of the surveyor and the plat speak for themselves whether they are correct. The ground taken in the argument, that the survey was not sworn to, was not taken in the court below, and cannot be urged here.

5. The copy of the will of Stephen F. Austin and probate thereof were objected to—

1. Because not proper in rebuttal.

2. Because the probate was irregular and void for want of jurisdiction.

3. Because not recorded in Austin county.

To the first objection we say, that after the defendants had introduced evidence tending to show that the title under the deeds from the Cummingses to J. E. B. Austin was really in S. F. Austin, he having paid the consideration, the plaintiffs had the right to show that the equitable interest of S. F. Austin had been asserted by his legal representatives, and had been decided against said representatives. The will and probate were offered to show that James F. Perry was the legal representative of S. F. Austin; it would have been proper evidence at any stage of the trial, for it was in relation to the issues made by the pleadings. But the proper time for it, according to the order of proceeding pursued at the trial, was in rebuttal of the evidence of defendants, who had attempted to prove the title in the estate of S. F. Austin.

In regard to the second objection, the petition accompanying the will for its probate was directed to the probate court of Brazoria county, in which county it was alleged the testator died. The order of the judge directs that the will be recorded, and that letters testamentary thereon be granted to the executor named in the will.

6. The copy of the record of the Supreme Court, at July term, 1842, between Hill *et al.* v. Perry *et al.*, was objected

to, first, because not proper in rebuttal; second, because the judgment is for the recovery of title, or such a recovery or release or change of title as was required by law to be recorded in the county where the land lies, and not recorded in Austin county; third, because the judgment was not on the pleadings, but an agreement of compromise, which reduced it to a conveyance between the parties, and not recorded; the first objection requires no further answer.

To the second and third objections we say, that the legal title under the deeds from the Cummingses was clearly in those who had succeeded to the rights of J. E. B. Austin.

The character of this suit was recited.

VI. The sixth error assigned is, that the court erred in the charge it gave to the jury. This charge is believed to be as correct an exposition of the law applicable to the facts as proved, as could well have been framed.

VII. The seventh error assigned is, that the court erred in refusing to give the jury the instructions asked by defendants.

1. The first three charges asked by defendants and refused by the court relate only to the claim of Samuel A. Cummings, and have no connection with the claim of plaintiffs.

2. In regard to the fourth, it is sufficient to say, that the plaintiffs do not claim any title under S. F. Austin. They claim and receive under the title from the Cummingses to J. E. B. Austin. They say that S. F. Austin never had any title, and they plead and introduce the record of the suit of his executor against their ancestor, to show that a court of competent jurisdiction had decided the title to be in those succeeding to the rights of J. E. B. Austin. This charge had no application to the facts as proved, and was properly refused.

3. The fifth charge asked was refused, because sufficiently given in the general charge. This charge related to the defense of limitation, and a reference to the general charge of the court will show that the court charged the jury cor-

rectly on the subject of limitation in reference to the facts proved.

4. The charges numbers seven to sixteen, asked by defendants, were refused, because part had been given in the general charge of the court, and the others were not proper.

5. The seventeenth charge was properly refused, and the eighteenth, so far as it was applicable to the facts of the case as proved, was fully embraced in the general charge.

6. The eighth error assigned is, that the court erred in overruling the motion for a new trial and the amended motion. This showing was answered by the facts.

VIII. This litigation has been protracted. It was commenced by a married woman, who claimed as heir of one who died before the revolution, and who had not the means of being well informed in regard to the title, for it will be seen that J. E. B. Austin acquired the land before he was married to Mrs. Hill.

The principal defendant, it now appears, was well informed of all the facts about the title from the first, for her acts had repeatedly admitted, down to about the time this suit was brought, that the title of the two leagues was where the judgment in this case has placed it; though her pleadings no where set up the true state of facts.

This court must be satisfied, from an examination of the case, that the verdict and judgment are strictly in accordance with the legal and equitable rights of the parties, and that it ought not to be disturbed.

LINDSAY, J.—The law and most of the facts in this case having been under review in this court on two previous occasions, as reported in 3 and 14 Texas, we are partially relieved from an investigation of some of the points raised in the record by the examination and conclusions arrived at by our predecessors in relation to them. There were a verdict and judgment in favor of the plaintiffs in each of the trials in the court below, and each of those

judgments was reversed by this court, and the cause remanded for further proceedings. Some additional facts were introduced in the district court bearing upon the question of right of the original plaintiffs, but none contravening the right of Samuel A. Cummings, one of the defendants and an intervenor, to recover as the heir of his father, William Cummings, whatever right and title his said father died seized and possessed of. In the opinion of the court in Portis v. Hill, 14 Texas, 69, determining the question of Samuel A. Cummings' heirship, we fully concur. But his right of inheritance to the property in controversy is still dependent upon the complex questions involved in the determination of the rights, legal and equitable, of the plaintiffs in this suit, and it must stand or fall, to some extent at least, by the fate which awaits the adjudication of their rights in the subject-matter of this contest. We must briefly present a statement of the nature of the controversy, the grounds of the plaintiffs' claim, and, generally, the character of the defenses set up, in order that the exposition of our views of the law applicable to the facts may be the more intelligible.

Under a decree of imperial colonization law of Mexico, of date the 16th day of July, 1823, [Paschal's Dig., Art. 519,] a concession was made to James Cummings, as a colonist, of one sitio of land in what is now Brazoria county, and one hacienda in Austin county, and carried into actual grant by the official execution of the required document on the 16th day of August, 1824. The consideration for the grant of the hacienda seems to have been the undertaking of James Cummings to build a saw and grist-mill upon it. At the time of the grant the family of James Cummings was composed of his mother Rebecca, his brothers John and William, and his sisters Sarah and Rebecca.

On the 5th day of February, 1825, James Cummings conveyed by deed one undivided moiety of the hacienda

to James E. B. Austin for the consideration therein expressed. After making and publishing an instrument purporting to be a will, James Cummings died in 1826. In that instrument or will, recognizing an equity of his brothers, John and William, in the hacienda, he makes them the devisees of all his right and title in that portion of his real estate.

About the time of, or shortly after, the death of James Cummings, James E. B. Austin married Eliza M. Westall, by whom he had one son, Stephen F. Austin, jr., whom he left, at his death in 1828 or 1829, as his heir at law. On the 12th day of June, 1828, John and William Cummings coveyed by deed to James E. B. Austin the two middle leagues of the hacienda, which seems to have been intended as a partition of rights in the realty, and a substitution for the deed of James Cummings to James E. B. Austin of a former date, and the passing the equity, admitted in the will, out of them into James E. B. Austin. John and William Cummings, on the 12th of June, 1828, entered into a contract of partition of their rights in the hacienda, which was acknowledged by them before the alcalde of the jurisdiction of Austin on the same day, and which is so certified by the alcalde; but the deed of partition is only signed by John Cummings. This deed was made and acknowledged on the same day on which they made the conveyance to James E. B. Austin, and was intended, no doubt, to make an entire partition of the rights of the three parties, who alone conceived themselves, at the time, to be interested. William Cummings departed this life in the latter part of the year 1828 or in 1829, intestate, and leaving an only child, Samuel A. Cummings, one of the defendants, and an intervenor against the claim of the plaintiffs. The mother, Rebecca, died about the year 1831, and the sister, Sarah, departed this life somewhere about the same period, childless and intestate. The widow of James E. B. Austin, and the mother

of Stephen F. Austin, jr., intermarried with William G. Hill in 1835 or 1836. Her son, Stephen F. Austin, jr., by her former husband, died childless and intestate in 1837, leaving his mother his sole heir at law. From the marriage of the mother with William G. Hill, the present plaintiffs sprung, who, with their father, William G. Hill, as the administrator of their mother, (she having died in 1847,) are now prosecuting this claim.

From this presentation of facts, the legal title of the plaintiffs to at least the two middle leagues of the hacienda seems to be complete; and is so, unless there be some prior or intermediate conveyances, or successions, which break the chain of its derivation. For, there are only two methods of acquiring title to real estate: either by the civil or common law, to wit, by descent, or succession, and by purchase. By purchase, its acquisition may be made in various ways. The title claimed by the plaintiffs has come to them by these methods conjointly. They insist that they take as heirs at law of their deceased mother, Eliza M. Hill, who inherited it from her deceased minor son, Stephen F. Austin, jr., who was the sole heir at law of her former husband, James E. B. Austin, who received his title by deed to one moiety of the hacienda from James Cummings, deceased, who was the original grantee from the Mexican government, and by conveyance from John and William Cummings, who were the devisees under the will of the original grantee, James Cummings. Such is the derivation of the legal title.

But it is objected, in defense, that the muniments of title introduced on the trial of the cause for the establishment of this right are defectively authenticated, and ought to have been rejected as instruments of evidence. This is certainly true, as a proposition of law, when attempted to be used against subsequent purchasers and creditors without notice; and in a mere action of ejectment at the common law, under such circumstances, several of them would

be wholly inadmissible. But blended as our system is, embracing both the law and the equity of every case under adjudication, the principles of equity, as well as of law, may be applied in determining their admissibility as proofs in the cause. They are all muniments of ancient date, and the defendants, from proof *aliunde*, are shown to have recognized and acted upon them from their origin, as if well understood and admitted facts; and it would seem ungracious and unconscientious, at this late date, to attempt to ignore and repudiate them as facts, to secure an unrighteous advantage. The law must hold parties to their admissions, whether by words or deeds, and they must be estopped and precluded from the assertion of claims in derogation of the rights of others, and in falsification of their own deliberate acts of admission, unless those admissions were made by mistake, or extorted by fraud or compulsion.

So far as the legal title is concerned, which passes as well by descent as by purchase, if the muniments of title of the plaintiffs have been legitimated by the admissions and conduct of the defendants as against them, (and we are thus authorized to consider the several conveyances as evidence in determining the rights of the parties,) it is most manifest that the legal title to the two middle leagues of the hacienda was in the plaintiff's mother at the time of her death in 1847. The only effect of the deed from John and William Cummings to James E. B. Austin in 1828 was to corroborate the deed of James Cummings in 1825, and to pass their equity, acknowledged to exist by the will, and served to define more specifically the interest of James E. B. Austin in the land, and operated as a severance of the tenancy in common; so that each of the parties might have his own portion of the realty for his separate enjoyment or disposition. We think this testimony has been so legitimated by the uniform recognition of it by Mrs. Portis, up to or near the time of the institution of this suit. Being so recognized uniformly by the party who claims

an adverse interest, it is both consonant with reason and justice to use it to fortify the legal title against the equities relied upon to defeat a recovery.

Whether we consider the case in its present form, as an action of trespass to try title, or as a trial to determine the superior equities to the right of property in the subject of the controversy, in either *forum* of trial, from all the attendant circumstances, all these muniments are entitled to receive their full force and effect. Viewed in that light, they establish a legal title in the plaintiffs to the two middle leagues of the hacienda.

To pass the mere legal title from one holder to another, it is not necessary that the conveyance should be recorded in an office of registration. The title of the grantor is effectually transmitted from the grantor by the act of signing and the delivering of the deed of conveyance. The policy of the government only intervenes, in requiring such instruments to be recorded, for the protection of creditors and subsequent purchasers. But such deeds are as valid, to all intents and purposes, in passing the title out of the grantor into the grantee, when unrecorded, as when recorded by the register. The legal title, then, to one moiety of the hacienda passed by the deed of James Cummings, in his lifetime, to James E. B. Austin. After the death of James Cummings, John and William Cummings, his devisees, by way of passing their equity, and of partitioning the several interests in the realty according to the legal rights of the parties, made a deed to James E. B. Austin for a specific portion of the territory, and divided between themselves the remainder equally in the terms of the will. Their deed to Austin conveyed no new estate, but restricted, to some extent, the limits of the legal estate previously granted by James Cummings. James E. B. Austin, after he acquired this legal title, married, and begat one child, and died, leaving this child, Stephen F. Austin, jr., surviving him.

The descent was cast upon this son, which vested the legal title in him. He afterwards died childless and intestate, leaving his mother as his only heir at law, who intermarried with William G. Hill, by whom she had six children; and since the institution of this suit the mother has died, leaving her six children her heirs at law, who, with their father as the administrator of their mother, are the plaintiffs in this controversy. Thus it is seen that the legal title has passed down to, and become invested in, these plaintiffs. We cannot ignore the facts, so abundantly established by the record, that the defendant, Mrs. Rebecca Portis, was fully cognizant of this transmission of the legal title from the Mexican government to James Cummings; from James Cummings to James E. B. Austin; the descent from him to his son; from the son to the mother; and from the mother to her children, the plaintiffs. Her membership in the family with her three brothers, James, John, and William, when the several deeds were executed, and when the will of James was made and published; her offering the will for probate; her claiming under the will, and asserting and establishing her right to the league of land on the Bernard, devised to her in that will; and the various other acts of recognition of the validity of the conveyance, and of the will of her brother James, preclude the possibility of any ignorance on her part of the origin and nature of the rights of the parties in this contest. We are happy, therefore, to concur most cordially with the court in the opinion in 14 Texas Reports, wherein the court said, " after those repeated solemn acts of admission, it is difficult to perceive upon what rational principle the appellants can claim now to be heard to controvert," these various facts of recognition of the right in the plaintiffs' ancestor. " A party ought not to be heard thus to contradict and falsify his own solemn admissions and declarations made before the judicial tribunals." This applies as well to the attitude of

the plaintiffs, in reference to the title, as to the co-defendant, Samuel A. Cummings.

We think the defendant should not thus be permitted to gainsay and to assail these evidences of the legal title, after such repeated recognitions of them, and absolutely claiming benefits under them; as in the instance of taking the league of land on the Bernard by the force and effect of one of the instruments of title by which the plaintiffs claim—the will of James Cummings. Thus we are brought to the conclusion, that the legal title is conclusive against the defendants, Portis and wife; and if this were a trial of an action of ejectment at the common law, in which the plaintiffs are compelled to recover on the strength of their own title, from the facts developed in this record they could not defeat the recovery of the plaintiffs. We grant that upon this evidence, as against an innocent purchaser, the plaintiffs could not succeed, because some of these instruments were not so acknowledged, proved up, and recorded, as would constitute constructive notice, according to the policy of the laws of registration, unless such subsequent purchasers had actual notice of these various alienations. But that excuse or apology does not exist in favor of the defendants, Mrs. Rebecca Portis and her husband, who, we are bound to conclude from the facts disclosed, had full knowledge of the transactions in regard to, and the rights of property exercised and claimed in, the land which is now in dispute. Having thus disposed of the points involved in the inquiry into the legal title, we are now brought to investigate and examine into the equities which are sought to be interposed against the plaintiffs' right in this controversy.

It is asserted that the equitable title to one moiety of the *hacienda*, or to the two middle leagues thereof, was in Stephen F. Austin, sr., by virtue of the deed from James Cummings, and the subsequent deed of John and William to James E. B. Austin; and that the holding of the legal

title by James E. B. Austin was a mere naked trust for Stephen F. Austin, sr.   We cannot so regard it.   It is contended that the proof in the cause shows that Stephen F. Austin paid the consideration for the conveyance to James E. B. Austin.   Be it so.   We will not presume that Stephen F. Austin violated his trust as the empresario under Mexican authority, in order to enter into any private stipulations, in making grants of the public domain of the government, for his own benefit.   Such a presumption would be an imputation upon his honor as a man, and a charge of malversation against him as a public officer. The introduction of such proof in this cause is neither german to the investigation, nor, in our judgment, is it warranted by the rules of law.   It is not properly a contest between the heirs, devisees, or legatees of Stephen F. Austin, deceased, or his privies in estate, with the parties in this suit; but it is wholly independent of them, and should have been kept distinct from any claim, or pretended claim, which such representatives or privies in estate might be able to set up in an independent cause of action.

It is not what is called in an action of ejectment at common law, to which our action of trespass to try title is likened, the showing of a superior and paramount outstanding title in another, to defeat a recovery; because, in order to give it that force and effect, the court would be bound to presume the malversation in office of one of the accredited agents of the government.   For such an acquisition of right would be in fraud of the government, and fraud will neither be presumed by the courts, nor will the courts suffer it to be presumed in the trial of the facts by a jury.   And here we are constrained to dissent from the reasons and conclusions of the learned and distinguished jurist who delivered the opinion in 14 Texas Reports, reversing and remanding this case for another trial.   In doing so, however, we feel a real pleasure that we are not compelled to assume the grave responsibility of overruling

what has been solemnly adjudged by a tribunal so eminent for its ability and judicial talent. But, the case being entirely reopened by the reversal, we are fully authorized again to explore the whole field of investigation, and to dispose of it according to our convictions of the law, as applicable to the facts of the case, without in the least degree detracting from the legal learning and judicial reputation of the jurist who delivered that opinion.

The subsequent claim of Stephen F. Austin, as set up in his will, has nothing whatever to do with the case; and in a contest between his legal representatives and the legal representatives of James E. B. Austin, no court of equity jurisdiction, which is regarded as a court of conscience, would lend its aid to transfer the legal title from the heirs of James E. B. Austin to the devisees of Stephen F. Austin. And we presume this was the ground of the decision in the case of Perry v. Hill, (however irregular that judgment may be,) which is referred to in the record.

We can, therefore, discover no equity superior, paramount, outstanding, in any other person, which would authorize a chancellor to vacate the legal title of James E. B. Austin, and the transfer of it from those claiming under him.

As to the forced heirship of the mother of the original grantee, the equity is altogether in favor of the alienee of James Cummings. The mother, being an inmate and member of the family at the time of the alienation, must be presumed to have known that the legal title was passing or had passed out of her son to James E. B. Austin; and that John and William, her other sons, with whom she continued to live till her death, were claiming and using the land, or the residue, as their own; and her silent acquiescence, for more than three years before her death, must be assumed as a ratification of the acts, and a full and complete assent to such alienation; and in conscience it would bind her, and therefore binds all who claim by,

through, or under her. In this conclusion, we are gratified to find we are sustained by the opinion of the court already referred to, and it is therefore needless to animadvert upon it further. She would have been concluded in her lifetime, and all her heirs or representatives are also concluded by her silent acquiescence.

The next inquiry which invites our attention is the statute of limitation, relied upon by the defendants, Portis and wife. From the view which we have already taken of the general aspect of the case, it is obvious that the defendants cannot derive any protection from an adverse possession of three years. Nor can they be protected by any proof apparent upon the record, under the limitation of five years, as having possession, performing the conditions demanded by the statute, nor by any other statute of limitation. The evidence does not show that the defendants had had such possession, adverse and continuous, prior to the institution of this suit, so as to bring them within the rules of the statute of limitation. This defense is certainly unavailing to the defendants, Portis and wife.

As to any possession prior to 1841, if any tenant was put in possession by John Cummings, adverse to the claim of J. E. B. Austin, it could not have been done in good faith; and, if not so done, it was unavailing by the Spanish law. The proof, however, conduces strongly to show, that the tenant, Sapp, professed to hold in his own right, and not under John Cummings, as appears from Atkinson's testimony. And that possession was finally abandoned. The possessions after 1841 were not of such a character as to bring them within the statute.

But it is argued that, as the purchasers from Portis and wife were in possession before the amended petition was filed in 1855, which for the first time set up the claim to the two specific leagues which had been severed from the tenancy in common, the statute of limitation may well apply for the protection of their claims. Not so, in our judg-

ment. They were all purchasers, and came into possession of their claims after the institution of this suit in 1845.

The original suit was a suit in equity for the establishment of the right to one moiety of the land, and for the partition of the tenancy in common; and it embraced the whole *hacienda* as the subject-matter of the contest. Such suit in equity is wisely and necessarily regarded by the law as notice to all the world to guard against the innumerable mischiefs which would infallibly and inevitably result from a disregard of this principle. All persons, then, who purchased during the pendency of that suit had notice, and were bound to take notice, till the final disposition of it. And in keeping themselves advised of its progress, if they wished to become interested in the subject-matter of its litigation, and were they vigilant, (as they were bound to be,) they would necessarily learn when the subject of the controversy became contracted or restricted; and as to the extent of those restricted limits they are bound to take notice, and have the same knowledge as of the original suit. Any other exposition of this rule in equity would let in all the mischiefs which its adoption was intended to exclude and prevent. We are therefore constrained to assume that the other defendants, the purchasers and tenants, so to speak, of Portis and wife, were, *lis pendens*, purchasers strictly within the rule of equity, and their right and title must abide the final fate of the title of Portis and wife. Being privies in estate to Portis and wife, we confess we know of no principle or rule of law which rendered it necessary to make them parties to the suit at all; because, if a writ of possession on the final judgment against Portis and wife should issue, it would command the ministerial officer of the court to put the plaintiffs in possession, turning out not only Portis and wife, but all others in possession, connected with them in estate. Besides, the suit after amendment was con-

ducted and carried on both upon the law of the case and the equities of the parties.

This amendment, under our system, cannot be characterized as a new cause of action. The original involved the whole territory. The amendment simply took in a part of the subject-matter, and the new defendants, having notice of the whole, necessarily had a like constructive knowledge of the parts. We, therefore, feel satisfied that the new or german defendants, as they are designated by the learned counsel for the defendants in his brief, can claim no protection under the statute of limitation.

There are various other points raised in the investigation of this case which we have not deemed it necessary to give any special consideration; and, in our view, they are not material in determining the rights of the parties in this suit.

According to our interpretation of the law, applied to the material and important facts disclosed by the record, the right, both legal and equitable, is with the plaintiffs in the court below, and they are entitled to the possession of the two middle leagues of the hacienda.

In regard to the rights of Samuel A. Cummings, in the subject-matter of the controversy, the court, in the opinion in 14 Texas Reports, said: "The only right asserted by the defendant, Cummings, is the right of inheritance from his father; that right is fully established by the evidence; and the jury, we think, would have been warranted by the evidence in finding a verdict in his favor for that part of the land claimed by him." So, too, we think; and we see no cause to change that opinion. Samuel A. Cummings is, consequently, entitled to the upper league and a half of the *hacienda* as the heir of his father, William Cummings; and John Cummings, the owner of the lower league and a half, having died in 1839 intestate, leaving his sister, Rebecca, the wife of Portis, his nephew, Samuel A. Cummings, and the unknown heirs of his deceased brothers, Thomas and Samuel—one of whom was domiciled in Kentucky, and the

other in Indiana, at the time of their deaths—as his only heirs at law; the lower league and a half is divisible in equity into four parts, of which the defendant, Rebecca Portis, is entitled to one-fourth; the defendant, Samuel A. Cummings, is entitled to one-fourth; the unknown heirs of Thomas Cummings are entitled to one-fourth; and the unknown heirs of Samuel Cummings are entitled to the remaining fourth. The inheritance of the lower league and a half, being in coparcenary, the equitable title of each inheritor or class of inheritors is to one undivided fourth part of said league and a half, unless Portis and wife have acquired by purchase one of the shares, which will, in that event, entitle them to one-half of the lower league and a half. We suppose there was sufficient evidence before the jury to satisfy them of such purchase, as they so found by their verdict.

The finding of the jury and the judgment of the court below being in their results in conformity with our view of the rights of the parties, both at law and in equity, the judgment is therefore

AFFIRMED.