**BLUEBONNET SAVINGS BANK, F.S.B., Appellant,**

v.

**GRAYRIDGE APARTMENT HOMES, INC. and John J. Harry, Appellees.**

No. 01–94–00243–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 14, 1995.

Rehearing Overruled Oct. 26, 1995.

John A. Gilliam, David B. Dyer & Scot F. Rogers, Houston, for appellant.

Valorie W. Davenport, Houston, for appellees.

Before COHEN, WILSON and HEDGES, JJ.

## OPINION

COHEN, Justice.

Appellant sought a deficiency judgment after it foreclosed its deed of trust on the Grayridge Apartments. The underlying promissory note was made by appellee Grayridge and was guaranteed by appellee Harry. The jury found that Bluebonnet was estopped from asserting its deficiency claim, and that its rights were both waived and barred by laches. On appellees' counterclaim, the jury found that Bluebonnet was grossly negligent in misrepresenting that the loan would be refinanced and awarded actual damages of $158,000 and exemplary damages of $474,000. The trial court rendered judgment on these verdicts. We reverse and render in part and reverse and remand in part.

In 1987, Grayridge borrowed from Reliance Savings Association to purchase apartments. Mr. Harry, Grayridge's president, personally guaranteed 50% of the note.

Bluebonnet acquired the note after Reliance failed. In May 1989, Bluebonnet gave notice of default. In June, Mr. Harry's attorney wrote Bluebonnet, disputing the default and stating that when Harry had borrowed the money, "all parties understood that the current structure of the loan would probably not be sufficient to allow (Grayridge) to perform according to its terms ... based on the projected cash flow ... and that further restructuring may well be necessary." The letter referred to the note's "sorrid [sic] and tortured history" and claimed that "the transaction was closed at the time with this expressed understanding and was subsequently affirmed by both parties after the closing."[1]

Mr. Harry claims that Bluebonnet's agents subsequently orally agreed to accept partial payment, even though they knew or should have known that Bluebonnet's loan committee would refuse the deal and foreclose. Harry admitted, however, that the lengthy negotiations never produced any written agreement to restructure the loan, and that he knew loan committee approval was required and might be refused, as it ultimately was. Appellees allege that while these nego-

1. Appellees cite no evidence supporting these claims, which are irrelevant to any issues raised in this appeal.

tiations dragged on from 1989 to 1991, occupancy in the apartments rose from 25% to 75%, and that Harry worked exclusively at the apartments, foregoing other business opportunities, all known to Bluebonnet. Harry complains that if he had known Bluebonnet would not agree to a workout, he would have abandoned the project, instead of managing it for two years, and would have earned money as a real estate broker, as he had in the five preceding years.

In its first point of error, Bluebonnet contends the evidence was legally and factually insufficient to prove a negligent misrepresentation to Mr. Harry, as the jury found in question 8.

On the no evidence point, we consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988). The jury's findings cannot be overturned when the record reflects more than a scintilla of evidence in support of the verdict. *Id.* In reviewing factual sufficiency points, the jury's verdict must be upheld unless the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). When reviewing factual sufficiency, we review all of the evidence, including that which is contrary to the verdict. *Id.*

The jury refused to find any fraud by Bluebonnet. It found Bluebonnet guilty of grossly negligent misrepresentation. Negligent misrepresentation can arise when a party represents that a contract has been formed, though in fact, no contract agreement exists. *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991). The claimant must show:

1.  that the informant supplied false information in a pecuniary transaction;

2.  that the information was supplied for the guidance of others in their business transactions;

3.  that the claimant justifiably relied upon this information;

4.  that the claimant suffered a pecuniary loss; and,

5.  that the informant failed to exercise reasonable care or competence in obtaining or communicating the information to the injured party.

*Id.*

As the El Paso court has cogently stated:

"[T]he tort of negligent misrepresentation frequently involves a defendant's statement that a contract exists, upon which plaintiff relies, only to later discover that the contract has been rejected or was never completed. Thus, negligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, *not usually available where a contract was actually in force between the parties.*"

*Airborne Freight Corp., Inc. v. C.R. Lee Enter., Inc.*, 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied) (emphasis added).

Here, the parties had a contract. The existence of a written contract makes it harder for a party to show reliance on subsequent oral representations. The contract itself is notice of binding duties, and when it requires that amendments be in writing, that is additional notice not to rely on oral representations. Thus, the court in *Airborne Freight* concluded, "The terms of the written contract simply belie any reliance on (the defendant's) verbal assurance. We distinguish this case from those negligent representation cases regarding failure to complete contracts. Here, a binding written agreement was entered by the parties and controlled their actions." *Id.* at 298. "The written contract contained ample cautionary language which would preclude exclusive reliance by a reasonable businessperson on verbal statements contradicting the written agreement." *Id.* at 297.

The evidence at trial shows that around September 20, 1989, Mr. Harry and Bluebonnet's agent, Will Fulton, discussed restructuring the loan. Harry testified that Fulton orally agreed to a payoff of $1,025,000. In October 1989, Bluebonnet's agent, Mr. Lin-

gle, stated, that "everything looked fine; [and] that he [Lingle] was getting ready to present it [the agreement] to the [loan] committee" and that "everything would be okay." Appellees contend that Bluebonnet's agents made these statements to induce Mr. Harry to continue managing the apartments, even though Bluebonnet intended all along to foreclose.

We find, as a matter of law, that appellees failed to prove they justifiably relied to their detriment on the statements by Bluebonnet's agents.

Bluebonnet never promised in writing to refinance. Appellees rely heavily on Mr. Harry's testimony about the September 20, 1989 meeting, where Mr. Fulton stated that Bluebonnet was "allowed at that time to take 90% of the appraised value" to settle the debt. Mr. Harry first said he would "think about it," and then offered $1,025,000, which exceeded the appraised value. Fulton then stated that Harry should "send him the financial statements and then put all this in writing and send it up to him and that he would get that to the loan committee." From this, Mr. Harry "perceived in (his) mind that Bluebonnet had made a representation" to accept $1,025,000 as full payment.

Viewing this evidence in the light most favorable to the verdict, we find it is no evidence of justifiable reliance by a reasonable businessperson. *See Airborne Freight,* 847 S.W.2d at 297. Mr. Harry admits that Fulton required further financial statements, that he told Harry to "put all this in writing," and that Fulton said the loan committee would still have to be consulted. Such actions do not signify a deal; they constitute negotiations. Interestingly, Mr. Fulton and Mr. Harry signed a document entitled "settlement negotiations agreement" before their discussion of September 20, 1989. In it, they agreed as follows:

> This meeting was held for the purposes of settlement negotiations and in the interest of open and frank discussions. All of the parties agreed that such discussions were in the context of settlement negotiations, and that none of the discussions or communications at the meeting could be introduced by either party against the other party in any litigation.[2]

This document is relevant in determining whether Mr. Harry's reliance was reasonable. Mr. Harry was an experienced, self-employed businessman who had completed a number of large commercial real estate transactions involving many millions of dollars. Considering 1) the language in the "settlement negotiations agreement," 2) the additional conditions and requirements placed upon him at the end of meeting with Mr. Fulton, and 3) his considerable experience in real estate, we conclude that Mr. Harry should have known that these discussions did not constitute an agreement to refinance. A reasonable businessperson, especially one with Mr. Harry's experience, would not confuse this for a promise to refinance and therefore would not reasonably rely on it.

It is significant that Bluebonnet's attorneys had been sending threats of foreclosure by certified mail to Mr. Harry regularly, perhaps even monthly, beginning as early as November of 1988. Other threats to foreclose were made by mail dated May 16, September 8, and September 21, 1989. The property was repeatedly posted for foreclosure, but scheduled sales were postponed in October, November, and December 1989, and in January and February 1990. Other threats to foreclose were issued on August 30, October 11, November 9, and December 5, 1990, and several letters agreeing to pass scheduled sales cautioned that, "in no event shall the agreement of Bluebonnet to pass the foreclosure sale be construed as an agreement by Bluebonnet to accept 1.1 million in full satisfaction of its indebtedness or to present that offer to the applicable regulatory authorities for approval." These letters also stated that Bluebonnet reserved the right to post the property for foreclosure

---

2. Of course, they were. No complaint about that    is before us.

during the next month, "pending their consideration of (Mr. Harry's) offer." Despite all of this evidence, Mr. Harry thought he had an oral deal that precluded foreclosure. What he actually had was a signed written contract that "contained ample cautionary language which would preclude exclusive reliance by a reasonable businessperson on verbal statements contradicting the written agreement." *Airborne Freight*, 847 S.W.2d at 297–98.

Mr. Harry relies on Bluebonnet's internal document of October 13, 1989, stating that its "business plan" was "foreclosure." He contends this shows that Bluebonnet's true intent differed from what he was then and later told. We conclude that any reliance on some agents' perceived intention not to foreclose was unreasonable in light of the frequent correspondence from Bluebonnet's lawyers threatening foreclosure and repeatedly posting the property for sale. Bluebonnet's intent to foreclose was hardly a secret; on the contrary, it was repeatedly communicated in an apparent effect to motivate a settlement.

Mr. Harry relies on conversations in October of 1989 with Bluebonnet's agent Mr. Lingle, who stated that, "he had been reviewing the file and that everything looked fine; that he was getting ready to present it to the committee. But one thing that he did need was this letter here extending the commitment letter." Mr. Harry contends this was a promise on which he could reasonably rely, even though Lingle required further information and the committee had not yet been consulted.

On October 26, 1989, Mr. Harry met with Bluebonnet's agents, Lingle and Burttschell, who told him, "Everything would be okay. Everything was going fine." However, once again, Lingle stated that "he was getting ready to take it to the loan committee."

Mr. Harry relies on a memorandum of December 7, 1990, showing that Bluebonnet had, on July 31, 1990 requested FDIC approval to foreclose. Moreover, the memo stated that it had declined Mr. Harry's offer

to settle for $1,025,000 at a time when he had a loan commitment from a third party for $1,075,000 because Bluebonnet was unwilling to allow him to keep the remaining $50,000 for repairs. We fail to see how these actions could create a basis for justifiable reliance on a promise to refinance. Bluebonnet was constantly threatening foreclosure, requiring additional information, and stating the need to get approval from its own loan committee or from regulatory authorities, while simultaneously posting the property for foreclosure.

Finally, there is no evidence that Bluebonnet's alleged misrepresentations caused more than a $20,000 loss to appellees. Appellees spent $20,000 in various fees directly related to attempting to refinance. Mr. Harry's other damages arose from the fact that he devoted all of his time to the Grayridge project and thus had to forego other business opportunities. Mr. Harry admitted, however, that he had given up his other real estate projects and decided to devote full time to the Grayridge Apartments in 1987—long before Bluebonnet made any representations to him. He did this because Reliance Savings, which made this loan to him, had promised to involve him in three or four other business opportunities, which would require all of his time; he knew he could not perform those obligations simultaneously with others. When Reliance failed, those opportunities were lost. Mr. Harry presented no evidence that he was considering "walking away" from the loan before Bluebonnet's representations, but then changed his mind. He presented no evidence that he stopped working in other real estate transactions due to Bluebonnet's misrepresentations. While Mr. Harry presented evidence of his annual income from real estate brokerage in the five years preceding his operation of Grayridge, he did not show any specific opportunities that he had to forego between 1989 and 1991, while he operated Grayridge.

For all of these reasons, point of error one is sustained.

■ In point of error two, appellants contend the evidence is legally and factually

insufficient to support the jury's finding, in question 10, that Bluebonnet was guilty of gross negligence.

We sustain this point of error for the same reasons we sustained point of error one. If there was no negligent misrepresentation, there was no grossly negligent misrepresentation.

■■■■ Moreover, we find no evidence that Bluebonnet knew that Mr. Harry was working solely on Grayridge and foregoing other opportunities as a result. In fact, Mr. Harry furnished a financial statement to Bluebonnet showing that he owned (and was therefore responsible for operating) another 80 unit apartment project and a rent house. To support a finding of gross negligence, there must be evidence that Bluebonnet had "actual subjective knowledge of an extreme risk of serious harm." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994). The magnitude of the risk is judged from the viewpoint of the defendant at the time the events occurred. *Id.* at 23. The harm anticipated must be extraordinary harm, not the type of harm ordinarily associated with breaches of contract or even with bad faith denials of contract rights, harm such as "death, grievous physical injury, or financial ruin." *Id.* at 24. Mr. Harry's damages were that he continued to incur expenses and forego other employment in order to preserve the corporate appellee's property and to avoid his own personal liability on the guaranty. But as president of the corporate appellee, Grayridge Apartment Homes, Inc., Mr. Harry was already obligated to manage these apartments, which were a corporate asset, and as an individual guarantor, it was to his benefit to avoid personal liability. He was devoting all his time to doing so before Bluebonnet's representations were made. The risk that a debtor will not walk away from a binding contract, that he will instead devote time and money in an unsuccessful attempt to comply with that contract, as happened here, is not, as a matter of law, the type of "serious injury" contemplated by *Moriel.*

Point of error two is sustained.

In point of error four, appellant contends there is legally and factually insufficient evidence of damages, actual and punitive. Based on our decision to sustain points of error one and two, this point of error is moot. *See* discussion of *Moriel, supra*, however, regarding punitive damages.

Point of error four is overruled.

In point of error five, Bluebonnet contends the evidence is legally and factually insufficient to support the jury's findings that Bluebonnet could not recover on its promissory note and guarantee because of waiver, estoppel, and laches. We agree.

■■■■ Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming it. *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co., Inc.*, 416 S.W.2d 396, 401 (Tex.1967). Waiver of some rights does not mean that the party relinquishes its rights to have the contract fully performed as to the remaining provisions. *Ryan v. Thurmond*, 481 S.W.2d 199, 206–07 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.).

The note provides that failure to accelerate the debt upon a default "shall not constitute a waiver of the right to exercise it in the event of any subsequent default." Similarly, the guaranty agreement provides that neither delays, omissions, lack of diligence, nor lack of care by the holder in exercising its rights will "impair or affect the rights of the Holder or the Note and/or the Obligations and the liability of Guarantor hereunder." Bluebonnet's attorneys repeatedly wrote to Harry, stating that "passing" the various foreclosure sales was not a waiver of any debt or of any future right to foreclose.

No evidence showed that Bluebonnet intended to relinquish its rights. The negotiations on the $1,025,000 figure showed an intent to collect at least that amount. The repeated foreclosure postings are the opposite of waiver. Bluebonnet's conduct was not inconsistent with its rights under the note or

the guaranty. Therefore, there is no evidence to support a finding of waiver.

Estoppel precludes recovery by a person whose conduct causes another to give up some valid right against the first person. *Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Estoppel may be equitable or promissory. *Collins v. Allied Pharmacy Management, Inc.*, 871 S.W.2d 929, 937 (Tex.App.—Houston [1st Dist.] 1994, no writ). In either case, reliance is fundamental. *Id.* We have held that there was no justifiable reliance here; therefore, there is no evidence to support the affirmative defense of estoppel.

Finally, laches is an equitable remedy that prevents a plaintiff from asserting a claim due to a lapse of time. *McMasters v. Mills*, 30 Tex. 563, 567 (1868). The case is said to be "stale." *Id.* Although a court applying the doctrine of laches is not bound by any statute of limitations, the statute of limitations is one measure of whether a claim has become stale. *See Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 840 (Tex.1968). Laches and statutes of limitations are "analogs." *McMasters*, 30 Tex. at 566–67. Accordingly, laches does not bar a plaintiff's suit before the statute of limitations has run unless estoppel or "extraordinary circumstances" are present. *Barfield*, 426 S.W.2d at 840.

Bluebonnet sued within the limitations period. Moreover, Bluebonnet's claim is not barred by estoppel or by "extraordinary circumstances." In *Barfield*, the court held that "extraordinary circumstances" do not include claims that but for the plaintiff's delay in suing, the defendant would have tried to set aside its lease with the plaintiff, moved its business to another location, or refused to enter into a subsequent lease with the plaintiff. *Barfield*, 426 S.W.2d at 840. Mr. Harry claims that but for Bluebonnet's delay, he would have obtained alternate financing. This is not "extraordinary circumstances."

We sustain the fifth point of error.

In the sixth point of error, appellant contends the evidence is legally and factually insufficient to support the jury's answer of "none" as the amount due and owing as a deficiency on the note. We agree.

It is clear that a deficiency existed, that Grayridge Apartment Homes, Inc. owed it, and that Mr. Harry guaranteed half of it. The present amount is unclear. Therefore, unless the parties can stipulate in this court, we will remand the cause for the trial court to determine the amount. If the parties stipulate the amount, we will render judgment in favor of Bluebonnet and against Grayridge Apartment Homes, Inc. for the full amount and against Mr. Harry for half of the amount. TEX.R.APP.P. 80(b).

Point of error six is sustained.

We need not decide point of error three, which complains of a fatal conflict in the jury findings.

The trial court's judgment is reversed. Judgment is rendered that Grayridge Apartment Homes, Inc. and John J. Harry take nothing from Bluebonnet Savings Bank on the claim for negligent misrepresentation. The cause is remanded to the trial court to determine the amount of the judgment to be rendered on the note and guaranty in favor of Bluebonnet and against Grayridge and Harry, respectively.