**GRAYBAR ELECTRIC CO., INC., Appellant,**

v.

**LEM & ASSOCIATES, L.L.C., Appellee.**

No. 14–06–00714–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 6, 2008.

Rehearing Overruled May 22, 2008.

Ben L. Aderholt, Christopher Von Drieberg, Reagan W. Simpson, and H. Victor Thomas, Houston, for Appellants.

Joseph R. Knight, Austin, Theo W. Pinson, Houston, for Appellees.

Panel consists of Justices ANDERSON, FROST, and MIRABAL.*

## MAJORITY OPINION[1]

KEM THOMPSON FROST, Justice.

A company contracted to sell a power generation system, including a manufacturer's warranty, to a second company for sale to a third company to be used in a United States Army project in the Iraqi desert. The seller sued the first buyer for amounts allegedly owed under the sales contract, and the first buyer counterclaimed. The trial court rendered judgment that (1) the seller recover $3.35 million plus prejudgment and postjudgment interest and attorney's fees, and (2) the first buyer recover $100,000 plus prejudgment and postjudgment interest on its counterclaim. We conclude the trial evidence is legally and factually sufficient to support the trial court's denial of a credit or affirmative award based on the seller's failure to provide the manufacturer's warranty. We conclude the trial evidence is legally and factually insufficient to support the trial court's conclusion that a change order between the seller and the first buyer is void based on failure of consideration,

---

* Senior Justice Margaret Garner Mirabal sitting by assignment.

1. This opinion is a majority opinion as to all issues except appellant's thirteenth issue; it is a plurality opinion with respect to appellant's thirteenth issue.

fraudulent inducement, or duress. Based on the change order, the evidence conclusively proves the first buyer is entitled to credits that substantially reduce the judgment in favor of the seller. Because the seller's recovery is being significantly reduced on appeal, we reverse the judgment in favor of the seller and remand to the trial court with instructions to render judgment in favor of the seller for the lower amount as well as the attorney's fees and interest hereafter found by the trial court following further proceedings. Because the trial court erroneously failed to award any attorney's fees to the first buyer based on its unchallenged recovery on its contract counterclaim, we reverse and remand with instructions for the trial court to determine the reasonable attorney's fees for this counterclaim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2003, as part of its work for the United States Army in Iraq, Kellogg Brown & Root Services, Inc. (hereinafter "Kellogg") contracted with appellant Graybar Electric Co., Inc. ("Graybar") for the purchase of a Pratt & Whitney FT8 Twin Pack System Turbine package (hereinafter "Twin Pack"), along with related goods and services, to be deployed as a power generation system in the Iraqi desert. Graybar contracted with appellee LEM & Associates, L.L.C. (hereinafter "LEM") for the purchase of a Twin Pack. LEM is a supplier of electric-generating equipment, owned by Lee Mathieu. LEM, in turn, had a contract to purchase a Twin Pack from Ron Bigham d/b/a Green Power Energy (hereinafter "Bigham"). Bigham had a contract to buy a Twin Pack from Allegheny Energy for $8 million.

Under its contract with Kellogg, Graybar was required to arrange for Pratt & Whitney to provide a warranty covering the Twin Pack and lasting until one year from the synchronization of the Twin Pack or 18 months from delivery, whichever came first (hereinafter "Warranty"). Under its contract with Graybar, LEM was required to provide such a warranty. Under hurried and somewhat chaotic circumstances, LEM sold the Twin Pack to Graybar but did not provide the Warranty. Graybar received the Twin Pack and started loading and shipping it out of the country on August 7, 2003. One week later, Pratt & Whitney notified Graybar that, due to the drastically different operating environment in the Iraqi desert, Pratt & Whitney was not willing to simply consent to the assignment of the existing warranty from Allegheny. Within two weeks, Pratt & Whitney gave Graybar a proposal for a warranty covering the Twin Pack, which would cost $703,000. Despite the proposal, no party ever purchased a warranty from Pratt & Whitney that would cover the Twin Pack in Iraq. Graybar, however, did contract with Pratt & Whitney to provide various services, including technical services and oversight at a cost of $998,100, that Graybar claims were required to make the Twin Pack warrantable.

While there had been disagreement between Graybar and LEM as to what was being purchased under the contract and at what price, on or about September 3, 2003, Graybar and LEM signed a letter agreement containing a change order (hereinafter "Change Order"), which stated that the original contract price was $12,102,000 and that deductions should be made from this price for the following:

(1) a $2 million payment that Graybar made directly to Allegheny to obtain release of the Twin Pack,

(2) a black start generator,

(3) costs to convert the Twin Pack from 60 Hz to 50 Hz, and

(4) the cost of gas compression skids.

After making these deductions from the contract price under the Change Order

and after subtracting the $6,150,000 that Graybar already has paid LEM, the amount outstanding would be $2,671,456.

Before the Twin Pack was commissioned and started up, the United States Army suspended the project.

LEM filed this suit against Graybar. Graybar counterclaimed against LEM and filed third-party claims that are not relevant to this appeal. After a bench trial, the trial court rendered judgment in favor of LEM and against Graybar in the amount of $3.35 million plus prejudgment interest, postjudgment interest, attorney's fees and costs. The trial court also rendered judgment in favor of Graybar in the amount of $100,000 on its counterclaim for "commission costs" plus prejudgment interest, postjudgment interest, and costs.[2]

The trial court issued findings of fact and conclusions of law, stating, among other things, the following:

- On July 29, 2003, LEM sent Graybar a pro forma invoice for a Twin Pack with an invoice price of $11.5 million.
- Subsequently, LEM represented that the Twin Pack would have an extended Pratt & Whitney warranty against certain defects for a period of 18 months from sale or one year from commissioning, whichever occurred first.
- On or about August 7, 2003, Graybar accepted LEM's pro forma invoice dated July 30, 2003, requiring a 50% initial payment with Graybar's purchase order, 40% before shipment, and 10% at commissioning.[3] This in-

voice was amended by a pro forma invoice dated August 5, 2003.

- LEM agreed to convert the Twin Pack from 60 Hz to 50 Hz; however, LEM's failure to make this conversion was excused by Graybar's act of moving the equipment out of the country without giving LEM the required amount of time to accomplish the conversion.[4]
- LEM's failure to provide the Pratt & Whitney warranty and failure to accomplish the conversion are excused by Graybar's obtaining the consent of LEM to pay Allegheny directly, concealing the fact that Graybar would be obtaining a bill of sale directly from Allegheny for the purpose of evading its payment obligations to LEM. Graybar did not pay LEM the amounts it owed to. Though LEM offered to pay up to $1 million for a Pratt & Whitney warranty, Graybar did not accept this offer.
- Even if LEM's performance had not been excused, the court found that Graybar only suffered a loss in the amount of $100,000, which the trial court found was the commercially reasonable cost of performing the conversion from 60 Hz to 50 Hz in the United States.
- The issue of the warranty is "moot" because Graybar never purchased a warranty for the Twin Pack and because, even if LEM had provided a warranty at the time of sale, the warranty would have expired by February 2005, and there is no evidence of

---

**2.** The trial court also awarded Bigham judgment against LEM; however no party has appealed this part of the trial court's judgment, and it is not relevant to this appeal.

**3.** This is the first and only time the trial court mentioned this July 30, 2003, invoice in its findings of fact.

**4.** This finding appears to conflict with the trial court's judgment in favor of Graybar for $100,000 in "commission costs," by which the trial court appears to be referring to these "conversion costs."

any defects that would have given rise to a warranty claim during the time period in which the warranty would have been in effect.

- The consideration for LEM to enter into the Change Order was that LEM would be promptly paid the amount owed by Graybar to LEM on the purchase order. Because that did not occur, the consideration failed. In addition, the evidence shows that Graybar had no intention of making such "prompt" payments at the time the Change Order was executed and only made such a representation to secure LEM's signature to the Change Order. LEM relied on this representation.
- In this sale of goods between two merchants, Graybar accepted LEM's offer to sell the Twin Pack with the Warranty, and the conversion services, all for a total of $11.5 million, with 50% due on contracting, 40% due on shipping, and 10% upon commissioning.
- Although article 2 of the Uniform Commercial Code governs the contract between Graybar and LEM, the common law governs the Change Order. Graybar obtained the execution of the Change Order from LEM by misrepresentations, upon which LEM relied to its detriment. The Change Order is void due to failure of consideration, fraudulent inducement, and/or duress on the part of Graybar.
- Graybar is entitled to no damages or credits other than a credit of $100,000, and after applying this credit, LEM is entitled to judgment against Graybar for breach of contract in the amount of $3.25 million.[5]
- Graybar's counterclaims concerning warranty on the generator fail be-

cause the issue is moot; the counterclaims also fail due to waiver and estoppel.

Graybar has appealed, asserting fourteen issues. LEM has not appealed.

## II. STANDARDS OF REVIEW

Because findings of fact in a bench trial have the same force and dignity as a jury verdict, we review them for legal and factual sufficiency of the evidence under the same standards we apply in reviewing a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994).

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their

---

**5.** This finding is inconsistent with the trial court's judgment awarding $3.35 million against Graybar and then rendering judgment in favor of Graybar in the amount of $100,000 on its counterclaim rather than crediting $100,000 against LEM's claim.

testimony. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex. App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet,* 61 S.W.3d at 616.

## III. ISSUES AND ANALYSIS

### A. Did the trial evidence conclusively prove the seller's failure to provide a manufacturer's warranty resulted in $1,701,100 in damages to the buyer?

First, we conclude that the sale of goods is the essence or dominant factor of the contract between LEM and Graybar; therefore, article 2 of the Uniform Commercial Code ("UCC") applies to this contract.[6] *See* TEX. BUS. & COM. CODE ANN. § 2.102 (Vernon 1994) (stating that article 2 of the UCC applies to transactions in goods); *Continental Casing Corp. v. Siderca Corp.,* 38 S.W.3d 782, 787 (Tex. App.-Houston [14th Dist.] 2001, no pet.) (holding that, if a contract contains a mix of sales and services, article 2 of the UCC applies if the sale of goods is the "dominant factor" or "essence" of the transaction). Therefore, we are faced with a relatively unusual situation in which the seller delivers the principal good that is the focus of the article 2 contract but does not deliver a required manufacturer's warranty for that good.

Graybar seeks to recover an affirmative claim or a credit of $1,701,100 based on

LEM's failure to provide the Warranty. This is not an instance of a breach of warranty; rather, it is a breach of a promise to provide a warranty. In such a circumstance, various measures of damages might be appropriate. In some cases, a benefit-of-the-bargain measure of damages might be the best choice because it would give the buyer the difference between the market value of the good with the warranty and the market value of the good without the warranty. *See Allstate Ins. Co. v. Furr,* 449 S.W.2d 295, 298 (Tex.App.-Amarillo 1970, writ ref'd n.r.e.). In this case, however, the contract does not allocate the purchase price so as to provide a specific price for the warranty. Furthermore, there is no evidence as to the difference, if any, between the market value of the good with the warranty and the market value of the good without the warranty, and Graybar did not seek recovery based on this measure in the trial court.

The Warranty would have expired by March 2005. If a claim had arisen during the period that would have been covered by the Warranty, Kellogg might have sought to recover against Graybar the damage it incurred because of the absence of the Warranty, and Graybar could have sought this same claim against LEM. *See, e.g., Voisin v. O.D.E.C.O. Drilling Co.,* 744 F.2d 1174, 1179 (5th Cir.1984) (holding that party who breaches promise to obtain insurance for other party is liable for breach-of-contract damages for the amount that would have been covered by the insurer had the insurance been obtained). In this case, as noted by the trial court, there is no evidence that anything occurred that would have triggered coverage under the Warranty.[7] Graybar sold the Twin Pack

---

6. The trial court also concluded that article 2 of the UCC applies to LEM's sale of the Twin Pack to Graybar.

7. Graybar seems to assert in places that this measure of damages can never be used because the damages always must be measured at the time of the breach. Nonetheless, Graybar also cites section 2.714(a), which does not

to Kellogg in August 2003, and there is no evidence in the record that Kellogg has asserted a deduction, claim, or charge against Graybar based Graybar's failure to provide the Warranty.

■ Under its third issue, Graybar argues that the trial court erred in not awarding it a credit or affirmative award for $998,100. Before the United States Army suspended the project, Graybar contracted with Pratt & Whitney for technical services and oversight at this price. Graybar asserts that it was trying to remedy LEM's failure to provide the Warranty and that Pratt & Whitney required that it perform these services before it would issue the Warranty. The record contains copies of emails sent by Pratt & Whitney before August 27, 2003, indicating that, for Pratt & Whitney to provide a Warranty to the new owner of the Twin Pack, Pratt & Whitney would need to (1) inspect the Twin Pack to determine if it had been stored and shipped in accordance with Pratt & Whitney procedures, (2) review the installation of the Twin Pack to confirm compliance with Pratt & Whitney procedures, and (3) witness the start-up of the Twin Pack. These emails do not state how much Pratt & Whitney's services in this regard would cost. In a letter dated August 27, 2003, Pratt & Whitney submitted to Graybar a proposal for the following services:

> Technical Services and Oversight on a Consultant Basis to assist [Graybar's] people in installing the equipment in Iraq. This price is for four people to support construction and start up of our equipment. The total days for this activity is 210 man days.... This is for

one site manager to be in Iraq for 70 days, an electrical advisor to be in Iraq for 49 days, a mechanical advisor to be in Iraq for 42 days[,] and a start-up engineer to be in Iraq for 49 days....

Pratt & Whitney stated it would charge Graybar $998,100 for these services (hereinafter "Technical Services"). In the August 27, 2003 letter, Pratt & Whitney did not state that performance of the Technical Services was necessary for Pratt & Whitney to provide the Warranty; however, Pratt & Whitney does state that a quote for the Warranty has been provided under a separate proposal that "addresses all the technical and commercial conditions." In this separate proposal for the Warranty, Pratt & Whitney does not state that its proposal to provide the Warranty for $703,000 is contingent on its provision of any services or upon the items stated in the prior emails. In its purchase order accepting Pratt & Whitney's proposal to provide the Technical Services, Graybar describes the Technical Services as "Commissioning, Start-up and Technical Support," and Graybar does not state that Pratt & Whitney required Graybar to retain Pratt & Whitney to perform the Technical Services before it would issue the Warranty. Likewise, in the invoices for the Technical Services, Pratt & Whitney does not state that these services are related to the Warranty.

During the time of the Twin Pack transaction, Morgan McDaniel was a Graybar employee working on this transaction. At trial, McDaniel described the Technical Services as "oversight on a consultant basis to assist in installing of equipment in Iraq." The following day, McDaniel testi-

---

contain this requirement, and Graybar seeks to recover damages based on the value of services provided or quoted by Pratt & Whitney after the time of breach. *See* Tex. Bus. & Com. Code Ann. § 2.714(a) (Vernon 1994) (allowing buyer under certain circumstances to

recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable).

fied that Bigham's counsel was mistaken when he understood McDaniel's testimony the day before to be talking about the Warranty issue with Pratt & Whitney. McDaniel testified that he did not testify the day before that Pratt & Whitney was paid "a whole bunch of money in connection with this warranty issue."

Graybar cites testimony from Phil Collins of ECP Tech Services, a contractor hired by Graybar. Collins testified that Graybar paid $998,100 for Pratt & Whitney to provide technical supervision. Collins stated that Pratt & Whitney was providing a warranty and, with that, they were going to have "a certain number of spare parts to do," and they want to make sure the installation would be done properly. Collins testified that Pratt & Whitney sent "a guy over there to make sure that the foundations are right, that the turbines are set right, that the alignment is good." Collins stated that Pratt & Whitney, as a matter of risk mitigation, would oversee everything "to make sure that when you turn [the Twin Pack] on[,] it's in good shape." Graybar also cites testimony from its expert John Scott regarding the Pratt & Whitney proposal to provide services for $998,100. Scott testified that Pratt & Whitney would want to do inspecting or supervision before it would issue a warranty, as an assurance that the equipment had been installed, commissioned, and started up properly. Gregg Rogers of Graybar testified that Graybar paid Pratt & Whitney $998,100 "to get it warrantable." None of these witnesses testified that Pratt & Whitney required that it be paid

$998,100 for these services before it would issue the Warranty. Even if they had so testified, the trial court, as fact finder, was free to disbelieve this testimony.[8] *Pascouet*, 61 S.W.3d at 615–16.

Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's decision not to award any damages based on the $998,100 that Graybar paid to Pratt & Whitney. *Pascouet*, 61 S.W.3d at 615–16 (concluding evidence was legally and factually sufficient to support certain damage findings).

■ As to Pratt & Whitney's proposal to provide a warranty covering the Twin Pack for $703,000, Graybar did not purchase this warranty. While Graybar was not required to cover in order to recover damages, this proposal does not require the trial court to award $703,000 as damages for LEM's failure to provide the Warranty. Unlike the Twin Pack Warranty that Pratt & Whitney had given Allegheny, the warranty proposed in the quote limited Pratt & Whitney's aggregate liability to $703,000. As stated above, Graybar promptly sold the Twin Pack to Kellogg and did not show that it incurred any liability to Kellogg based on the failure to provide the Warranty. Graybar did not prove up any benefit-of-the-bargain damages. Graybar elected not to purchase a warranty from Pratt & Whitney. Under the applicable standards of review, presuming without deciding that the evidence is legally insufficient to support the trial court's findings that LEM is excused from

8. On direct examination, Collins read from one of the Pratt & Whitney emails described above, and he answered in the affirmative when asked by Graybar's counsel if the email describes "what has to be done in order to get the one-year warranty quoted on and issued." Collins also answered in the affirmative when asked if the Pratt & Whitney proposal regarding the Technical Services was "to carry out

... those negotiations [for the terms of the Warranty]." This testimony is conclusory and, as noted above, it is contradicted by subsequent documents regarding the Warranty and the Technical Services as well as by part of McDaniel's testimony. In any event, the trial court was free to disbelieve Collins's testimony.

providing the Warranty, we conclude that the evidence is legally and factually sufficient to support the trial court's decision not to award Graybar any damages based on LEM's failure to provide the Warranty.[9] *Pascouet,* 61 S.W.3d at 615–16 (concluding evidence was legally and factually sufficient to support certain damage findings). Accordingly, we overrule Graybar's third issue.

**B. Are the trial court's findings that the Change Order is void due to failure of consideration, fraudulent inducement, and duress supported by legally sufficient evidence?**

In its fifth, eighth, ninth, tenth, and eleventh issues, Graybar challenges the trial court's failure to give Graybar credits under the Change Order. The trial court noted that the Change Order, on its face, would lower the amount Graybar owes LEM; however, the trial court found that the Change Order is void based on failure of consideration, fraudulent inducement,

and duress.[10] Graybar asserts that the trial evidence is legally insufficient to support the trial court's findings in this regard.

Although the trial court correctly concluded that the sale of the Twin Pack was a transaction governed by article 2 of the UCC, the trial court erroneously concluded that common law governs Graybar's purchase order for the Twin Pack and the Change Order signed by the parties regarding this transaction.[11] *See* Tex. Bus. & Com. Code Ann. § 2.102; *Continental Casing Corp.,* 38 S.W.3d at 787. The sale of goods is the essence or the dominant factor of the Change Order; therefore, article 2 applies to the Change Order. *See* Tex. Bus. & Com. Code Ann. § 2.102; *Continental Casing Corp.,* 38 S.W.3d at 787. Under article 2, no consideration is needed for an agreement that modifies an article 2 contract. *See* Tex. Bus. & Com. Code Ann. § 2.209; *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 314 (Tex.1999). LEM asserts that, even if the

9. In finding of fact 11, the trial court found that, even if LEM's performance had not been excused, Graybar *only* suffered a loss in the amount of $100,000, which the trial court found was the commercially reasonable cost of performing the conversion from 60 Hz to 50 Hz in the United States. Therefore, the trial court found that Graybar did not suffer a loss based on LEM's failure to provide the Warranty.

10. On appeal, LEM asserts that Graybar's request for credits against LEM's recovery cannot succeed because Graybar's breach of the contract by its alleged failure to timely pay (and in other regards) discharged LEM from its obligations under the contract. This assertion is incorrect because, after these alleged acts, LEM treated the contract as still in effect rather than rescinding the contract. *See Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982) (holding that, despite election-of-remedies doctrine in *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848 (Tex. 1980), nonbreaching party had to decide whether to rescind the contract or seek to

enforce it when the material breach occurred, rather than waiting until after trial and before judgment to decide, and stating that nonbreaching party waived its right to rescind the contract based on the other party's material breach by (1) treating the contract as still in effect following the material breach and (2) by filing suit to enforce the contract); *Gupta v. Eastern Idaho Tumor Inst., Inc.,* 140 S.W.3d 747, 757–58 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (holding that, as a matter of law, nonbreaching party was bound by the contract despite other party's material breach because nonbreaching party continued to demand performance under the contract following the material breach).

11. On appeal, LEM asserts that the trial court necessarily found that Graybar violated the duty to act in good faith imposed by section 1.203 of the UCC and that the trial court refused to enforce the Change Order because of this finding. The trial court made no such findings. Indeed, the trial court concluded that Texas common law rather than the UCC governs the Change Order.

UCC governs the Change Order, it is still a legal nullity because it purports to modify Graybar's prior purchase order; whereas the trial court found LEM's July 30, 2003 and August 5, 2003 pro forma invoices represented the parties' contract. The Change Order refers to both Graybar's purchase order and to LEM's July 30, 2003 pro forma invoice. Under the unambiguous language of the Change Order, LEM and Graybar agree that adjustments should be made to the amount of Graybar's obligation under the sale-of-goods contract already existing between the parties. Therefore, as a matter of law, the Change Order falls under section 2.209, and no consideration is needed for it. *See* TEX. BUS. & COM. CODE ANN. § 2.209; *El Paso Natural Gas Co.,* 8 S.W.3d at 314. Under the applicable standard of review, we conclude the trial evidence is legally insufficient to support the trial court's finding that the Change Order is void because the consideration for the Change Order failed.

■ Regarding the trial court's duress finding, first, LEM did not plead duress. *See* TEX. R. CIV. P. 94 (stating that duress is an affirmative defense that must be pleaded). Second, as a matter of law, there can be no claim of duress unless the following elements are present: (1) a threat or action was taken without legal justification; (2) the threat or action was of such a character as to destroy the other party's free agency; (3) the threat or action caused the opposing party's free will to be overcome and caused the other party to do that which it would not otherwise have done and was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection. *McMahan v. Greenwood,* 108 S.W.3d 467, 482 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Under the applicable standard of review, the trial evidence

is legally insufficient to support the trial court's implied finding of these five elements as to the execution of the Change Order.

■ Regarding the trial court's fraudulent-inducement finding, the trial court necessarily found, among other things, that (1) Graybar made a material representation that was false; (2) Graybar knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Graybar intended to induce LEM to act upon the representation by signing the Change Order; and (4) LEM actually and justifiably relied upon the representation. *See Haase v. Glazner,* 62 S.W.3d 795, 798–99 (Tex. 2001); *Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840, 843 (Tex. App.-Houston [1st Dist.] 2004, pet. denied).

In its appellate briefing, LEM asserts that a Graybar representative unknown to Mathieu met Mathieu in Graybar's Houston office and falsely promised that Graybar would immediately pay LEM approximately $2.8 million if Mathieu signed the Change Order. LEM argues that based on this representation and in light of a recent conference call and Mathieu's fear that Graybar would never pay what it owed, Mathieu signed the Change Order because he was willing to take on additional obligations in exchange for Graybar's alleged promise of immediate payment of $2.8 million. However, the only evidence of this alleged misrepresentation is Mathieu's testimony that while he was at Graybar's Houston office in September 2003, a woman, whom he thought was Silvia Gatrell,[12] appeared and said, "I need you to come with me. We have a document that you need to sign." Mathieu testified that he went with her to another office, and she presented him with the Change Order. Mathieu then testified as follows:

---

12. Silvia Gatrell signed the Change Order on     behalf of Graybar.

And she asked me to sign that. I said, ["]Am I going to get paid,["] 'cause I thought she was Silvia Gatrell. She had it signed by Silvia Gatrell. And she said yes. I said, ["]We'll get paid right off of this?["] She said, ["]Yes.["] Well, I looked at this and I saw what they had there and I saw, you know, 88.[sic] We're going to get 2.8 million dollars on it right off, I'll sign it. No legal fees. Nothing. We'll do it.

Mathieu testified that his state of mind concerning the signing of the document was that he would get paid immediately. In sum, the only possible evidence of fraudulent inducement is that a woman whom Mathieu did not know but whom he thought was Silvia Gatrell (1) asked him to sign the Change Order, (2) told he him was going to get paid, and (3) told him he was going to "get paid right off of this." Based on these three statements and after looking at the Change Order, Mathieu believed he would be paid $2.8 million immediately, and so he decided to sign the Change Order.

LEM claims a reasonable factfinder could conclude that this woman fraudulently induced Mathieu to sign the Change Order because "right off" is an adverb meaning "right away" or "immediately." However, the record evidence is that the unknown woman used "right off" in a prepositional manner, indicating that Mathieu would be paid "right off of [the Change Order]." Under the applicable legal standard, the trial evidence is legally insufficient to support the trial court's finding that this woman made a material representation that she knew was false or made a representation recklessly as a positive assertion without any knowledge of its truth. In any event, even if this woman had made a false representation with scienter, under the applicable legal standard, the trial evidence is legally insufficient to support the trial court's finding that Mathieu justifiably relied upon this representation. *Bennett v. Cochran*, No. 14–00–01160–CV, 2004 WL 852298, at *6 (Tex.App.-Houston [14th Dist.] Apr. 22, 2004, no pet.) (holding in memorandum opinion that, as a matter of law, there was no evidence to support the jury's finding that plaintiff's reliance was justifiable); *Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 226–27 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (affirming summary judgment as to fraud claim because there was no genuine issue of material fact as to whether the plaintiff's alleged reliance was justifiable); *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651–52 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (holding that there was no evidence to support jury's finding that plaintiff's alleged reliance on lender's alleged statements was justifiable); *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 909 (Tex. App.-Houston [1st Dist.] 1995, writ denied) (holding there was no evidence to support jury's finding that alleged reliance by borrower on alleged oral assurances by lender that loan restructuring proposal would be accepted was justifiable).

Because the evidence is legally insufficient to support the three bases on which the trial court concluded that the Change Order is void, the trial court should have calculated the amount outstanding based on the Change Order, which would have resulted in an amount outstanding of $2,671,456.[13] Accordingly, we sustain

---

**13.** The trial court found that LEM's failure to perform the conversion was excused by Graybar's alleged actions in August 2003 in allegedly moving the Twin Pack outside the United States without giving LEM enough time to accomplish the conversion. The trial court also found this failure was excused by Graybar's obtaining the consent of LEM to pay Allegheny directly while allegedly concealing the fact that Graybar would be obtaining a

Graybar's fifth, eighth, ninth, tenth, and eleventh issues.[14]

### C. Should the attorney's fees award in favor of LEM be remanded for further proceedings in light of the reduction in LEM's recovery?

Graybar argues that, if this court significantly reduces LEM's recovery, then this court should reverse the award of attorney's fees in favor of LEM. We agree. Because this court is not reasonably certain that the trial court's attorney's fees award was not significantly affected by its error in awarding LEM $3.35 million, we sustain Graybar's twelfth issue, reverse the attorney's fee award in favor of LEM, and remand for a new trial as to the amount of attorney's fees LEM should be awarded. *See Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex.2007) (per curiam).

### D. Did the trial court err by not awarding Graybar attorney's fees based on the trial court's award of $100,000 to Graybar under Graybar's counterclaim?

■ In its thirteenth issue, Graybar asserts the trial court erred in not awarding Graybar Chapter 38 attorney's fees based

on Graybar's recovery of $100,000 under its counterclaim. After rendering judgment that Graybar recover $100,000 on its counterclaim, the trial court issued findings of fact and conclusions of law that indicate Graybar should take nothing on its counterclaim, either because the trial court found that LEM's obligation to convert the Twin Pack from 60 Hz to 50 Hz was excused or because, even if LEM's performance was not excused, the $100,000 should be applied as a credit against LEM's contract claim. The trial court did not change its judgment after it issued these findings and conclusions. In any event, in its judgment, the trial court awarded Graybar $100,000. On appeal, Graybar has not sought to change this $100,000 into a credit against LEM's contract claim. *See* Tex. R. App. P. 38.1(e); *Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986) (holding that "the court of appeals may not reverse a trial court's judgment in the absence of properly assigned error"). LEM has not sought this relief on appeal either; indeed, it could not because it has not appealed the trial court's judgment. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 171 (Tex. 2004). Therefore, this court cannot disturb the trial court's judgment awarding Graybar $100,000 on its counterclaim,[15]

---

bill of sale directly from Allegheny, allegedly for the purpose of evading Graybar's payment obligations to LEM. Even if these matters would excuse LEM's failure to perform the conversion, they would not prevent LEM from later agreeing in the Change Order to a credit in favor of Graybar based on LEM's failure to make the conversion.

**14.** LEM claims that Graybar cannot seek credits based on the Change Order because it did not challenge the trial court's thirteenth finding of fact. We disagree. In any event, to the extent this finding conflicts with allowing credits to Graybar based on the Change Order, we construe Graybar's brief as having sufficiently challenged this finding.

**15.** Presuming without deciding that under the correct analysis, Graybar should take nothing

on its counterclaim, no party has assigned error in this regard, and this court has no power to reverse the trial court's rendition of judgment on Graybar's counterclaim. *See Karnes*, 717 S.W.2d at 903. Even if the trial court's judgment is erroneous, we must give effect to its unambiguous language, without considering extrinsic matters. *See Reiss v. Reiss*, 118 S.W.3d 439, 441–42 (Tex.2003) (holding court must give effect to unambiguous language of judgment even if such a judgment is wrong under the law); *State Farm Lloyds, Inc. v. Williams*, 791 S.W.2d 542, 546 (Tex.App.-Dallas 1990, writ denied) (stating that, if judgment is unambiguous, courts may not use extrinsic matters to give the judgment an effect different from that expressed by the language of the judgment). We cannot use the trial court's findings of fact and conclu-

and, based on this award, Graybar asserts the trial court was required to award Graybar attorney's fees.

■ Under Texas law, the award of attorney's fees to a plaintiff recovering on a valid contract claim is mandatory under section 38.001 if there is proof of the reasonableness of attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1995); *Hassell Const. Co., Inc. v. Stature Commercial Co.*, 162 S.W.3d 664, 668 (Tex.App.-Houston [14th Dist.] 2005, no pet.). While a trial court has the discretion to set the amount of attorney's fees, it does not have the discretion to deny fees altogether if they are proper under section 38.001. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001; *Hassell Const. Co., Inc.*, 162 S.W.3d at 668. Because Graybar introduced evidence regarding reasonable attorney's fees and because Graybar recovered on its contract counterclaim, the trial court erred by not awarding reasonable attorney's fees for this claim. Accordingly, we sustain Graybar's thirteenth issue, reverse the trial court's judgment to the extent it failed to award Graybar attorney's fees, and remand to the trial court for further proceedings to determine the amount of Graybar's reasonable attorney's fees under Chapter 38.

## IV. CONCLUSION

Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's decision not to award Graybar any damages based on LEM's failure to provide the Warranty. However, the evidence is legally insufficient to support the three bases on which the trial court concluded that the Change Order is void. The trial court should have calculated the amount outstanding based on the Change Order, which would have resulted in an award of $2,671,456 in actual damages in favor of LEM. Because no party has challenged the trial court's judgment awarding Graybar $100,000 on its counterclaim and because this award is based on the conversion charges that are part of the credit from the Change Order, we must deduct $100,000 from the credit against LEM's contract claim to avoid giving Graybar a windfall. Therefore, we reverse the part of the trial court's judgment dealing with the LEM's claims against Graybar, and we remand the case to the trial court with instructions to render judgment in favor of LEM and against Graybar awarding actual damages of $2,771,456 plus court costs and the appropriate award of prejudgment interest, postjudgment interest, and reasonable attorney's fees to be determined by the trial court in further proceedings on remand. We reverse the trial court's judgment to the extent it failed to award Graybar attorney's fees based on Graybar's counterclaim, and we remand to the trial court for further proceedings to determine the amount of Graybar's reasonable attorney's fees under Chapter 38 and for rendition of judgment based on this fee award. We need not address the other issues Graybar asserts on appeal.[16]

sions of law to change the unambiguous language of the judgment. *See Reiss*, 118 S.W.3d at 441–42; *Williams*, 791 S.W.2d at 546.

16. In its fourteenth issue, Graybar asserts the trial court erred in holding that 50% of the contract price was due and owing and in awarding prejudgment interest on those amounts because the contract the trial court found as the basis for recovery recited that those amounts are not due until certain events occur that have not been shown by LEM to have occurred. We need not reach this issue because we have concluded that the trial court should have based its decision on the Change Order while this issue and the argument under it presume for the sake of argument that the August 5th LEM invoice is the operative document. In one sentence in one, Graybar states that, "if the Court were to uphold the Change Order, which made the

Based on our rulings, for good cause, and in the interest of justice, we order Graybar and LEM to each pay one-half of the aggregate appellate costs incurred in this case.

ANDERSON, J., concurring without opinion.

MIRABAL, J., concurring and dissenting.

## CONCURRING AND DISSENTING OPINION

MARGARET GARNER MIRABAL, Senior Justice (Assigned).

I respectfully concur in part and dissent in part.

I agree with the Majority Opinion up to the disposition of Graybar's 13th issue dealing with attorney's fees. In my opinion, if the trial court erred, the error was harmless, and accordingly Graybar's 13th issue should be overruled.

The portion of the Majority Opinion with which I concur holds that the Change Order is the contract, and that LEM is entitled to full recovery of all amounts due under the contract. Graybar is not entitled to any offsets. Graybar owes LEM 100% of the amounts due under the con-

tract. Accordingly, Graybar is not a "prevailing party" in any sense of the term.[1] As a matter of law, Graybar is not entitled to recover attorney's fees.

The trial court's judgment does not award Graybar any attorney's fees, and therefore the trial court's judgment is correct in this regard. If, as the Majority Opinion states, the trial court arrived at this correct result in an incorrect manner, then the trial court's error is clearly harmless. See Tex. R. App. P. 44.1(a).[2]

We should overrule Graybar's 13th issue.

---

balance due upon issuance of the warranty and the commissioning of the Twin Pack, the award of prejudgment interest would be erroneous, but the real error would be in the award of damages to LEM." Graybar's brief does not contain any argument, analysis, citations to the record, or legal authorities regarding any assertion that under the Change Order, Graybar has no liability to LEM at present. See Tex. R. App. P. 38.1(h); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 337 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

1. With regard to the $100,000 judgment on Graybar's counterclaim, the Majority Opinion correctly recognizes that the $100,000 "credit" contained in the Change Order cancels out the $100,000 award in the counterclaim. Graybar owes the full amount due under the

Change Order, and is not entitled to any offsets or credits to lessen its contract obligations under the Change Order. The counterclaim judgment is effectively meaningless. Graybar is not a prevailing party.

2. Rule 44.1 Reversible Error in Civil Cases.

(a) *Standard for reversible error.* No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of:
(1)probably caused the rendition of an improper judgment; or
(2)probably prevented the appellant from properly presenting the case to the court of appeals.
Tex.R.App. P. 44.1(a).